IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____
                          )
UNITED STATES OF AMERICA,  )    No. 1:20-CR-01210-JAP
                          )
          Plaintiff,       )
                          )    Pete V. Domenici U.S. Courthouse
     vs.                   )    Pecos Courtroom
                          )    Albuquerque, New Mexico
CHARLES BRENT JUSTICE,     )    Tuesday, June 2, 2020
                          )    1:00 P.M.
          Defendant.       )
_____)


                 TRANSCRIPT OF PROCEEDINGS
   MOTION APPEALING MAGISTRATE'S DETENTION ORDER (Doc. 19)
            BEFORE THE HONORABLE JAMES A. PARKER
             SENIOR UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:   JON K. STANFORD
                     NICHOLAS MOTE
                     UNITED STATES ATTORNEY'S OFFICE
                     District of New Mexico
                     Post Office Box 607
                     Albuquerque, New Mexico   87103


For the Defendant:   JOE M. ROMERO, JR.
                     ROMERO & WINDER, P.C.
                     P.O. Box 25543
                     Albuquerque, New Mexico  87125


For U.S. Probation: SANDRA DAY
(via Zoom VC)

Reported by:         MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
(via Zoom VC)        United States Court Reporter
                     Phone:  (505)348-2334

        Proceedings reported by machine shorthand and transcript
produced by Computer-Aided Transcription.

1                    I N D E X

2                                                Page

3  ARGUMENT BY THE GOVERNMENT - MR. STANFORD ............83

4  RECOMMENDATION BY PROBATION - MS. DAY ................89

5  ARGUMENT BY THE DEFENSE - MR. ROMERO .................92

6  FURTHER ARGUMENT BY THE GOVERNMENT - MR. STANFORD ....93

7  FINDING OF THE COURT ...............................104

8

9                 W I T N E S S E S

10                                               Page

11 CHARLES BRENT JUSTICE

12     DIRECT EXAMINATION BY MR. ROMERO .................12
       CROSS-EXAMINATION BY MR. MOTE ....................29
13     REDIRECT EXAMINATION BY MR. ROMERO ...............45
       QUESTIONS BY THE COURT ...........................49
14     RECROSS-EXAMINATION BY MR. MOTE ..................52

15

16 ROBERT W. SAULTER

17     DIRECT EXAMINATION BY MR. ROMERO .................54
       QUESTIONS BY THE COURT ...........................61
18     CROSS-EXAMINATION BY MR. MOTE ....................62
       REDIRECT EXAMINATION BY MR. ROMERO ...............68
19

20

21 NATHANIEL SORENSON

       DIRECT EXAMINATION BY MR. STANFORD ...............69
22     CROSS-EXAMINATION BY MR. ROMERO ..................77
       CONTINUED CROSS-EXAMINATION BY MR. ROMERO ........88
23

24                   * * * * *

25

USA v. Justice                          Motion Hearing
20-cr-1210                                    6-2-2020

1  (In Open Court at 1:04 P.M.)

2          THE COURT:  Good afternoon.  The Court is in session.

3  Have a seat, please.

4          The case this afternoon is No. 2020-1210, United

5  States of America vs. Charles Justice.  Let me ask counsel to

6  state their appearances, please.

7          MR. STANFORD:  Jon Stanford and Nicholas Mote for the

8  Government, Your Honor.

9          MR. ROMERO:  Your Honor, Joe Romero on behalf of the

10 Defendant, Charles Justice.  Also with me sitting at counsel

11 table, with the Court's permission, is the Defendant's military

12 JAG defense counsel, Captain Robert Saulter, Your Honor.

13         THE COURT:  That's fine.

14         CAPTIAN SAULTER:  Thank you, Your Honor.

15         THE COURT:  The hearing this afternoon is on the

16 Defendant's appeal of the Magistrate Judge's detention order.

17 In preparation for the hearing, I've read the following

18 materials:

19         The Criminal Complaint, which is Document No. 1.

20         The Pretrial Services Report, Document No. 10, ex

21 parte.

22         The Motion Appealing the Magistrate's Detention

23 Order, this is Document No. 19, and attached to it is the

24 Memorandum from Colonel David Carlson.  That's Document 19-1.

25         Next was the United States response, Document No. 20,

1   and attached to the response was a photo album, that's

2   Document 20-1, a second set of photos that look like it was

3   instructions on how to prepare a sound muffler, and then

4   Document 20-3, which was 74 pages entitled, "The Great

5   Replacement Towards a New Society."  Then Document No. 20-4,

6   which was, again, the 10 pages of a memorandum from Colonel

7   David Carlson.

8        I did have a question about a part of Colonel

9   Carlson's conclusion.  He recommended that Mr. Justice's

10  squadron commander order a mental health evaluation to

11  determine whether he poses any threat to himself, his family,

12  or his community, and restrict Justice to the confines of

13  Kirtland Air Force Base pending the results of the mental

14  health evaluation.  Was the mental health evaluation done?

15       MR. ROMERO:  It was, Your Honor, and my understanding

16  from talking to my client and his military defense counsel, who

17  can also elaborate on this point, is it was completely found to

18  be normal.  He was found to not be suffering from any mental

19  health diagnosis or condition.  And, in fact, the three days of

20  initial restriction after his release were basically waived or

21  expired in part based on that finding by the mental health

22  evaluation, such that after the initial three days of

23  restriction to base, he was no longer required or restricted to

24  base after those initial three days in significant part based

25  on the positive finding by the mental health evaluator.

1          And if you'd like, Your Honor, with the Court's

2    permission, if I've missed anything, I would ask Captain

3    Saulter to address the Court further on that issue.

4          THE COURT:  Well, let me ask, is the mental health

5    evaluation a part of the record?

6          MR. ROMERO:  No, Your Honor.

7          THE COURT:  Can I get a copy somewhere?

8          MR. ROMERO:  Can Captain Saulter address you, Your

9    Honor?

10         THE COURT:  Sure.

11         CAPTAIN SAULTER:  Your Honor, I believe that that

12   would have to be through a request to the military treatment

13   facility at Kirtland Air Force Base.  It's a military mental

14   health record that is maintained there, and even though it was

15   done pursuant to that commander directed evaluation, the

16   commander has it and the military treatment facility has it,

17   but we don't have a copy.

18         THE COURT:  Okay.  How would you go about getting a

19   copy?

20         CAPTAIN SAULTER:  You'd either have to make a Privacy

21   Act request, so that he can request his own record from the

22   clinic, or else there's a law enforcement exception where law

23   enforcement can request the same.

24         THE COURT:  Okay.  All right, I was --

25         MR. MOTE:  Your Honor, if I may?

1          THE COURT:  Sure, go ahead.

2          MR. MOTE:  Your Honor, another option is if this

3    Court were to order production of that, we could work with the

4    Government for the United States Air Force to try and get a

5    copy of that for you.

6          THE COURT:  Okay.  The next thing that I read was

7    Document 20-5, which is a letter of counseling from Caleb

8    Green, Assistant Flight Chief, and then next Document 20-6,

9    which is a photo array of a search of the Defendant's residence

10   and vehicle.

11         Next I read a transcription of the audio proceedings

12   on March 18, 2020, before Judge Khalsa.  This basically appears

13   to be a lot of squabbling between lawyers about witnesses, and

14   that hearing was then continued to the following day whereupon

15   there was a record made of the proceedings on March 19th, 198

16   pages that I read.  It's this right here.

17         And then the last thing that I read is a Memorandum

18   from United States Probation Officer Sandra Day dated June 1,

19   2020, yesterday, which again concludes that there are no

20   conditions or combination of conditions that will reasonably

21   assure the appearance of the Defendant at court, or assure the

22   safety of the community.

23         Now, are there any other written materials that I

24   should have read prior to today's proceeding?

25         MR. STANFORD:  Not in the Government's opinion, Your

1   Honor.  And I wanted to also add something for the Court's own

2   knowledge and also the defense.  This case is still active.

3   There's an active ongoing investigation.  There's evidence that

4   we are sifting through.  We are conducting due diligence, and

5   we are re-examining things as becomes appropriate.

6           In the course of doing that, I was recently informed

7   by one of my investigators that -- I'll refer you to, I believe

8   it's Exhibit E or F in the Government's response to the Motion

9   for Appeal of Detention.  It is an Albuquerque Police

10  Department report detailing a man at the airport, who we

11  believed was Airman Justice.

12          THE COURT:  Is that in the record that I read?

13          MR. STANFORD:  It is.

14          THE COURT:  Well, let me see where that was.  The

15  United States response --

16          MR. STANFORD:  Document 23-7, Your Honor.  Sorry.

17          THE COURT:  Oh, 23-7.

18          MR. STANFORD:  That may be the underlying detention

19  hearing.

20          THE COURT:  What is Document 23?

21          MR. STANFORD:  Document 23-7, it's a State of

22  New Mexico Uniform Incident Report.  And I believe it's

23  Exhibit E or F.

24          THE COURT:  Okay, that's part of the record?

25          MR. STANFORD:  It is.  It was attached to my response

1  to the Motion for Appeal of Detention Order.

2  It's not necessary that Your Honor read it at this

3  time, because what I wish to inform the Court is that we have

4  since verified that it was not Airman Justice who is the

5  subject of that police report.  So we withdraw that from

6  consideration.  I just wanted to let the Court know that in our

7  due diligence, we had agents go out and view video and

8  reinterview witnesses, because it was an APD case originally.

9  We wanted to also go out and do an investigation, and we do not

10  believe that it was Airman Justice who went to Cutter Aviation.

11  THE COURT:  I don't believe that I've read the

12  documents to which you're referring.

13  MR. STANFORD:  I'm happy to provide it, but since I'm

14  withdrawing it, you may want to --

15  THE COURT:  Well, no, just identify it for the

16  record.  I didn't read it.

17  MR. STANFORD:  Okay.  It's Document 23-7.

18  THE COURT:  23-7?  And what is Document No. 23?  What

19  is it entitled?

20  MR. STANFORD:  That is my response to the Motion for

21  Appeal of Detention Order, Document 23 in the Court's record.

22  THE COURT:  Well, I have the United States response

23  to Defendant's Motion Appealing Detention Order.  It's filed as

24  Document No. 20.

25  MR. STANFORD:  I think that's the Magistrate version,

1  Your Honor.

2  THE COURT: Okay. Is it the same thing that you're

3  referring to?

4  MR. STANFORD: Document 23 is identical, except for

5  the APD report to which I'm referring. The exhibits are

6  identical, not the motion itself, or the response itself.

7  THE COURT: Tell me, again, how the APD report is

8  identified as an exhibit.

9  MR. STANFORD: Let me see. It would be Exhibit F, or

10  23-7.

11  THE COURT: Let me see if I have that. I don't have

12  the report for some reason. The last thing I have attached to

13  your response is Document 20-6, which is 85 pages of

14  photographs.

15  MR. STANFORD: I think Document 20 is the Magistrate

16  document, Your Honor.

17  THE COURT: Okay. Well, is 23-7 the same as 20-7?

18  MR. STANFORD: No, it is not.

19  THE COURT: It's not? Well, I don't have the report

20  that you're referring to.

21  MR. STANFORD: I believe Mr. Gonzales is retrieving

22  it for you, Your Honor.

23  MR. ROMERO: Your Honor, if I may, I have a copy

24  right here. I can tender it to the Court.

25  THE COURT: Do you want me to read it? Apparently

1    it's not relevant to the case.

2         MR. STANFORD:  Right.

3         MR. ROMERO:  Your Honor --

4         THE COURT:  I gather what the Government is doing is

5    withdrawing this exhibit.

6         MR. STANFORD:  Yes.  We've done a further

7    investigation and we're withdrawing that as an exhibit.

8         THE COURT:  Okay.  Here, let me return it to you.

9    Well, in any event, for record purposes, it's a document that I

10   have not seen.

11        Okay, anything else?

12        MR. STANFORD:  No, Your Honor.

13        THE COURT:  Mr. Romero, anything else on behalf of

14   Defendant Justice?

15        MR. ROMERO:  No, Your Honor.

16        THE COURT:  Okay.  Let me ask if you want to present

17   any witnesses today on behalf of the Government.

18        MR. STANFORD:  Your Honor, I do have the witnesses

19   who testified at the underlying hearing, they are here for

20   questioning if the Court desires, but I have interviewed them

21   extensively all along and I don't believe their testimony would

22   change, and I don't have much new information that I would seek

23   to elicit from these witnesses.  So if you are familiar with

24   the transcript of the underlying hearing, then you are also

25   familiar with the facts that we would introduce in evidence

1  today.

2       THE COURT:  Okay.  Well, I think what you're

3  referring to is, let's see, the transcription of the

4  proceedings on March 19th, 198 pages.  Yes, I have read that.

5  As you can see from all the yellow tabs, I have focused on

6  various areas.

7       MR. STANFORD:  It was quite an experience.  Does the

8  Court have any questions it would like to ask of either of

9  those witnesses?

10       THE COURT:  I don't believe so, but let me ask

11  Mr. Romero, do you have any further questions you want to ask

12  of them?

13       MR. ROMERO:  Not initially, Your Honor.  I do have a

14  witness to call.

15       THE COURT:  Okay.

16       MR. STANFORD:  That's fine.  I'll reserve the right

17  to call them in rebuttal, Your Honor.

18       THE COURT:  All right.  Go ahead and call your

19  witness.

20       MR. ROMERO:  We would call the Defendant,

21  Mr. Justice.

22       THE COURT:  Please unlatch his right hand so he can

23  be sworn.

24       (CHARLES BRENT JUSTICE, DEFENSE WITNESS, SWORN)

25

DIRECT EXAMINATION

BY MR. ROMERO:

Q.   Sir, could you state your full name, please.

A.   Charles Brent Justice.

Q.   Okay.  Mr. Justice, prior to your arrest in this federal case, where were you residing?

A.   On Kirkland Air Force Base.

Q.   Are you married, sir?

A.   I am.

Q.   What's your wife's name?

A.   Beatrice Ottomanelli.

Q.   And do you have any children?

A.   I do, one.  I have one son.

Q.   What's his age?

A.   He is 14 months.

Q.   How old are you, sir?

A.   I'm 27.

Q.   And you were obviously in the Air Force at the time of your arrest in this case.  Could you tell the Court when you joined the Air Force, at what age?

A.   It was May of 2014.  I want to say the first week of May 2014, at age 21.

Q.   And you've been continuously in the Air Force since that time?

A.   I have, yes.

1   Q.   And you're age 27 now?

2   A.   Twenty-seven now, yes, sir.

3   Q.   And had prior to that, what kind of employment history did

4   you have?

5   A.   Various employment ranging from fast food restaurants to

6   the company Sea-Doo.  I was a test rider for the company

7   Sea-Doo.  Just held various jobs, everything from handyman to

8   working at my church, or whatever.

9   Q.   And you're a native of what state, sir?

10   A.   Florida.

11   Q.   What particular city?

12   A.   Melbourne, Florida.

13   Q.   Sir, do you have any criminal history?

14   A.   None whatsoever.

15   Q.   Have you ever been convicted of any crime, either as a

16   civilian before you joined the Air Force or after you joined

17   the Air Force?

18   A.   No, sir.

19   Q.   And with regard to your job in the Air Force, could you

20   tell the Court what it is you do as part of your primary

21   occupation in the Air Force?

22   A.   My primary occupation is under the umbrella termed

23   Security Forces, so it varies based on everything from law

24   enforcement to security.  My job is particular to security, and

25   I'm the supervisor of a control center that watches over 2,000

1  nuclear weapons.

2  Q.   As part of your qualifying for or performing those duties,

3  were you required to have a security clearance?

4  A.   I am.  I currently do possess one.

5  Q.   Okay.  And as part of you having a security clearance, are

6  you aware that your social media accounts can be monitored?

7  A.   Absolutely.

8  Q.   And that's been the case since you first joined the Air

9  Force and first started doing this job and obtained this

10 security clearance of secret?

11 A.   I believe so.

12 Q.   Okay.

13 A.   Yes, sir.

14 Q.   And in the course of your job in the Air Force, have you

15 had any kind of firearms training, just basic firearms

16 training, and specialized firearms training?

17 A.   I did not attend any real specialized courses, but basic

18 firearms training, absolutely, with the weapons that we are

19 issued daily.  That's the limit of my experience.

20 Q.   And which are those?

21 A.   You're asking about the platform, sir?

22 Q.   Yes.

23 A.   So everyone's familiar with the M4.  That's what you

24 see in all the movies.  It's your classic carbine.  Your

25 Beretta M9s, that's a handgun.  That's usually my daily carry

1   at work because of my position now.  But I have been formally

2   trained on the 203 grenade launcher, the 240 machine gun, it's

3   belt fed, same with the 249, and various electronics that are

4   associated with those platforms.  But beyond that, no other

5   weapons systems.

6   Q.   And you've been so trained since what year?

7   A.   That would be 2015.

8   Q.   And in that time, 2015 to the present, have you ever

9   threatened or brandished a firearm to anyone?

10  A.   Not in the slightest.

11  Q.   Have you ever committed any kind of violent offense either

12  with or without a weapon?

13  A.   Negative.  Not at all.

14  Q.   And you had access, daily access, to these weapons since

15  2015?

16  A.   Yes, sir.

17  Q.   In the course of your job as a Security Forces supervisor,

18  did you ever have any personnel issues, problems that you were

19  written up for or disciplined for?

20  A.   I do have one.

21  Q.   What was that?

22  A.   It was for failing to wear a beret.  That's one of our

23  issued headgear.  In this particular instance, I was wearing my

24  helmet instead of my beret.

25  Q.   What kind of disciplinary action did you receive there?

1  A.   It was a Letter of Counseling.  We call it an LOC.

2  Q.   Okay.  Anything else?

3  A.   There was an Article 15, which is a non-judicial

4  punishment, for shoplifting from a store at the age of 23.

5  Q.   Some years ago?

6  A.   Some years ago, yes, sir.

7  Q.   And you took responsibility for that?

8  A.   Absolutely.  It was punished and fixed within 48 hours of

9  my act being conducted.  I apologized to all parties and

10  fulfilled the entire requirement for my commander within 48

11  hours and put it behind me.

12  Q.   Okay.  Now, you had -- you were arrested in this case

13  prior to the federal civilian court arrest by military

14  authorities; is that correct?

15  A.   I was, yes.

16  Q.   And my understanding, if I recall correctly, if you'll

17  bear with me, is that that occurred on or about February 19th,

18  is that correct, of this year?

19  A.   Yes, sir.

20  Q.   And that was an arrest by military officials regarding

21  violation -- or a UCMJ proceeding alleging violations of some

22  of the same statutes that you're here before the Court on

23  today; is that correct?

24  A.   That is correct, yes, sir.

25  Q.   And then subsequent to that, my understanding is that you

1  had what I think Captain Saulter corrected me is referred to as

2  a pretrial confinement hearing, the equivalent of a release

3  hearing, on February 27th; is that correct?

4  A.   I believe it was the 26th, sir, or 27th.  But, yes, sir,

5  we did have that hearing seven days later, after the arrest.

6  Q.   All right.  And at that hearing, who presided over that

7  hearing?

8  A.   It was a full-bird Colonel, last name Carlson.

9  Q.   And why was he selected, as far as you know, to preside

10 over that hearing?

11 A.   To my knowledge, he was selected by the wing commander,

12 made possible by the Government counsel at the time.  They are

13 selected due to their temperament, their position on the base,

14 the people they oversee.  Generally their competence when it

15 comes to looking at someone as if they're a danger or a flight

16 risk.  You know, being a character judge.

17 Q.   Did that particular hearing officer outrank your

18 commander?

19 A.   He did, yes, sir.

20 Q.   Were they of different rank or the same rank?

21 A.   Different rank.  My personal commander, my unit commander,

22 was below or subordinate to Colonel Carlson.

23 Q.   Okay.  And at that hearing, what was presented in your

24 favor in terms of you qualifying or being eligible for release?

25 A.   So, many things were presented on top of Captain Saulter's

1  case. Working with me, we covered multiple character

2  statements, both written and in person. People that were

3  present testified in person; those that were not had a plethora

4  of written character statements that came in.

5      MR. ROMERO: Excuse me, Your Honor.

6  BY MR. ROMERO:

7  Q.  And those are documented, or summarized in the

8  February 26, 2020, memorandum that was signed by Colonel

9  Carlson; is that correct?

10  A.  That's correct.

11  Q.  At the conclusion of that hearing, were you released?

12  A.  I was, immediately.

13  Q.  Okay. So that would have been either the 26th or the 27th

14  of February; is that correct?

15  A.  Yes, sir. It was the 26th, right after the hearing.

16  Q.  Okay. And what were the conditions of release as you

17  recall them?

18  A.  So, I was issued -- Colonel Carlson found none himself,

19  personally, but he did recommend in his findings at the end, I

20  believe it was like an opinion of sorts, for my unit commander,

21  Colonel Chamberlain, or Lt. Colonel Chamberlain, to issue a

22  Commander Directed Evaluation, we call it a CDE, a mental

23  health check, and then a 72-hour hold was placed on me. So the

24  confines of base. The only permission to leave the confines of

25  base would be for that mental health check, which was

1  immediately conducted with a Major Carter, who was the

2  commander of mental health.  He did it personally.

3  Q.   Since we don't have that report in front of us, and I

4  would remind you that you're under oath --

5  A.   Yes, sir.

6  Q.   -- could you testify as to the execution or performance of

7  that mental health evaluation?  What did you do and who did you

8  talk to?

9  A.   Absolutely.  So again, it was a Major Carter, last name

10  Carter.  He was, to my understanding, the commander of the

11  mental health section of the military treatment facility.

12  Again, he did it personally.  We did about an hour,

13  hour-and-a-half interview, followed by what must have been

14  500-plus questions on the computer, everything ranging from the

15  nonsensical to the standard.  Then the results were compiled

16  and tabulated, and then we met back up.  He put me in the

17  waiting room for about 30 minutes while he viewed them over,

18  then called me back to his office and pretty much said -- this

19  is a loose quote -- that I was as baseline as baseline gets.

20  Q.   What did you understand that to mean?

21  A.   That there were no issues.  He foresaw no issues, and he

22  told me that he would forward this document onto my commander

23  and that he would release me from that 72-hour hold pending his

24  reception of that document.

25  Q.   Okay.  And what did you do next?

1   A.    From that point, I went back home to the base.  Ironic

2   enough, I met my commander at the treatment facility, so I saw

3   him face-to-face and he verified, just by happenstance, that I

4   was there to do the mental health check.  I don't think he was

5   there for that purpose, but we caught up there.  And then I

6   went back to the base and minded my Ps and Qs for that 72 hours

7   until I got the notification that, hey, you're released and

8   you're good to go.  And then past that, there was no more

9   requirements.

10  Q.    Okay.  Past those 72 hours --

11  A.    Past those 72 hours, yes, sir.

12  Q.    -- and past the mental health evaluation?

13  A.    That is correct, yes, sir.

14  Q.    Okay.  So that was late February, and you were on

15  conditions of release until your arrest in this case, which if

16  I recall correctly occurred, I believe, March 16th?

17  A.    Yes, sir.

18  Q.    So from late February to March 16th, were you free to go

19  and come off the base as you pleased?

20  A.    Absolutely.

21  Q.    And did you ever make any attempt to flee?

22  A.    Not at all.

23  Q.    Did you ever make any attempt to arm yourself?

24  A.    Not at all.

25  Q.    Did you ever make any attempt to harm anyone?

1  A.    No, sir.

2  Q.    Okay.  Now, the Government has withdrawn this police

3  report where they alleged in a pleading that you, in uniform,

4  went to Cutter Aviation on or about March 13th, which I believe

5  would have been the Friday before your arrest on a Monday.

6  A.    Yes, sir.

7  Q.    I'm asking you, under oath, did you ever go in uniform, or

8  at any time, to Cutter Aviation?

9  A.    No, sir, never.

10  Q.    Were you fully compliant with your conditions of release

11  prior to your arrest on 16 March of this year pursuant to the

12  federal civilian court complaint that was filed after your

13  release on the military case?

14  A.    Yes, sir, I was, in every manner.

15  Q.    Now, Agent Justice, in this case there's lots of ink in

16  the Government's pleading to you basically having quite a

17  social media life.  Specifically, there's a reference to social

18  media accounts.  Could you tell Judge Parker what social media

19  accounts, if any, do you have or subscribe to?

20  A.    I regularly actively use Instagram and Facebook as the

21  primary two, blogging everything about my daily life or

22  whatever.  Like I said to you personally, I do have a Twitter,

23  but I do not use it.  It's not active.  I think it has my name

24  attached to it, but it's not actively utilized.  But Facebook

25  and Instagram are the two.

Q.    There's lots of screen shots offered to the Court as
exhibits with regard to politically sensitive, maybe
politically controversial, racist, borderline racist,
Islamophobic postings.  Are those postings that you posted on
your social media feeds?

A.    At no point did I ever post that, no, sir.

Q.    How did they get on your social media feed, speaking to
kind of an IT illiterate person here?

A.    Sure.  So there's algorithms, of course.  There's
mathematics that go into it.  The layman's term is, if you have
friends and they like something -- when I message a friend or
communicate with that person regularly about whatever, if they
like a post, sometimes they'll show up as sort of a maybe
you'll like it, too, kind of thing.  You know, your friends
like it, your circle likes it, maybe you'll like it, as well.
So you'll see things that you necessarily don't interact with
that just pass on by.  It doesn't mean you interacted with it,
it just means that it might just scroll on past your screen
just because someone that you communicate with interacts
with it.

Q.    In other words, if you have a friend who subscribes to
different social media sites or follows social media sites,
that could also be, if he tags you or if he posts something
where he's attaching that item, it would show possibly on
either your Facebook page or one of your social media accounts?

1  A.   Correct, it may show up.  It doesn't mean interaction had

2  occurred between myself and that item.

3  Q.   So, there's this picture been painted of you, Mr. Justice,

4  as being a racist, having racist views.  Could you tell me, are

5  you a racist?

6  A.   Not at all.

7  Q.   Tell me about that.  Do you have nonwhite friends?

8  A.   Absolutely.  If you'd like me to clarify.

9  Q.   Go ahead.

10  A.   In the military, as with many jobs that employ a lot of

11  people, you're forced to interact with others that you may not

12  have ever met otherwise.  Religions, ethnicities, backgrounds,

13  cultures, it doesn't matter.  So, yeah, I do run the gambit,

14  especially in my unit, of all colors, all thoughts, all

15  beliefs.  And a lot of them, it was banter back and forth

16  between friends.  So the summarization of it is that a lot of

17  these are years old between people that are no longer in the

18  military or, you know, have moved on to other bases.

19  Q.   So a lot of these social media posts that the Government

20  has included as exhibits for the Court's review, they're not

21  even current?

22  A.   Not in the slightest, no, sir.

23  Q.   Okay.  So you serve with African-Americans?

24  A.   I do.

25  Q.   Hispanics?

A.    I do.

Q.    That's sort of part and parcel of the military life; isn't that correct?

A.    Absolutely, yes.

Q.    Now, there was reference, and again, quite a lot of ink expended on you having downloaded a manifesto by an Islamophobic individual who committed a terrorist act in New Zealand, if I recall correctly.

A.    Yes, sir.

Q.    Did you download, or did you have that document?

A.    It was on my phone, yes, sir.  By nature of how modern phones work -- it was a PDF format, if that clarifies, so as soon as you click on it, it downloads to your device whether you'd like it to or not.

Q.    Let's talk about that.  In your job, your Security Forces job, is part of your portfolio, part of your training, to prepare for active shooter situations?

A.    Yes, sir, it is.  It's a part of my job.

Q.    Okay.  And in preparing for active shooter situations, what kind of training, formal training have you had, and what kind of informal training have you engaged in in preparation for such an incident that you would be called upon to respond to?

A.    Sure.  So, we'll start with the formal training.  Now, it changes year to year, but generally they try to assign two

1  weeks, set off, for -- let's see.  There's about 40 people in
2  my particular flight that I work with day in and day out, my
3  flight family.  There's about 40 of us, and we work about two
4  weeks, and that two weeks covers everything, like I said
5  before, from law enforcement to security.  I'd say no more than
6  two days, three days at most is dedicated to active shooter
7  training formally.  A lot of it is left to the unit to handle
8  off-line or, you know, on the downtime.  The beauty of working
9  in the desert is you have quite a lot of downtime.
10      So a lot of it is handled peer-to-peer.  Maybe the NCO,
11 who is a rank above you or two ranks above you, but close
12 enough to be peer-to-peer, is training you personally using
13 everything from documents, like you mentioned before, and other
14 various stuff online.  We can discuss it in a very offline, but
15 personal manner, so it's not so formal and ridge.  But the
16 information is still conveyed.
17 Q.   My question to you is, was one of the reasons that you
18 download that manifesto was to discuss it with your
19 subordinates as part of the informal training process that you
20 engaged in?
21 A.   Absolutely, which is why I'll also include, you don't see
22 the victim pictures or pictures of the shooter, himself.  We
23 know there's no honor there.  It was strictly what made them
24 tick, what happened before, how was the act conducted, how can
25 we catch this kind of stuff from happening again.

1  Q.   Was there ever an incident in your time at Kirtland where

2  the balloon went up, so to speak, and you were called upon to

3  respond to a potential active shooter?

4  A.   Yes, sir, there was.  I'm one of four remaining in the

5  unit that actually experienced it, so that's why I took this

6  active shooter stuff very seriously, to educate those beneath

7  me.

8       But the event occurred, I hope I'm right on this one, in

9  2016.  It might have been 2017, but 2016-2017 timeframe.  The

10  alarm went off and it was a real world response to an active

11  shooter occurring on the west side of the installation.  It

12  happened right at shift change.  All the indicators said it was

13  real.  All the indicators said this was a planned attack, and

14  it made sense in regard to the times.  It still kind of chokes

15  me up, so I'm trying not to cry on the microphone here.

16       But, yeah, so we responded, and I think a lot of us

17  realized that our job isn't a joke.  Everyday, day in and day

18  out, more or less, you know, sometimes it feels like a joke,

19  you're just sitting there twirling your thumbs.  It became

20  suddenly very real, and so we took it seriously from that point

21  forward.

22  Q.   okay.  Now, according to the pleadings that I've reviewed

23  from the Government, they also reference some antipolice

24  textbooks or literature that was found during the execution of

25  the search warrant of your home.  Could you explain to the

1  Court whether or not there was such material and the reason

2  for it?

3  A.   So, there were.  There were four books in total.  I don't

4  remember all the titles.  I do remember one.  It was called,

5  "Our Enemies in Blue."  But suffice it to say, they were all

6  textbooks from UNM.  My wife graduated from UNM, and they were

7  a part of her courses, her last year courses.  And we were

8  getting ready to move, so they were out on the kitchen table.

9  I'd never viewed them personally.

10 Q.   And what was her major in college?

11 A.   She graduated with a major in psychology and a minor in

12 criminology.

13 Q.   And those textbooks related to that?

14 A.   They were.

15        MR. STANFORD:  Your Honor, just briefly, at no point

16 in any part of our case have we alleged that the textbooks

17 contributed to our feelings or investigative conclusions

18 regarding Airman Justice.  It was solely with regard to the

19 materials that were downloaded as saved files to his phone.  We

20 did not address his wife's textbooks.

21        THE COURT:  All right.  Go ahead.

22        MR. ROMERO:  Thank you.

23 BY MR. ROMERO:

24 Q.   So sort of pivoting off of Mr. Stanford's statement here,

25 again, we come back to your social media or your phone

1  material.  Again, was any of this actually created by you?

2  A.   Negative.  No, sir.

3  Q.   And in addition to the reference to you having material

4  that they find objectionable, which may or may not be accurate,

5  regardless of your First Amendment right to possess it, was

6  there also significant material in your social media account

7  that had nothing to do with any of these politically

8  controversial subjects?

9  A.   Absolutely.  I devote my social media to my family,

10 primarily, especially with a young son.  But yes, sir, there

11 was a plethora of stuff that was definitely nonpolitical and

12 noncontroversial.

13 Q.   How long have you been around firearms?

14 A.   Since the age of 18, since the legal age of 18.

15 Q.   So, long before you joined the Air Force?

16 A.   Absolutely, yes, sir.

17 Q.   And you consider yourself a firearms hobbyist in that

18 regard?

19 A.   A hobbyist, an enthusiast, yes, sir, absolutely.

20 Q.   Okay.  So separate from that, sir, during all this time

21 that you've legally owned and possessed firearms, or handled

22 firearms in the Air Force, been trained on firearms, again,

23 have you ever espoused any belief coming out of your mouth, or

24 anything that you've written, to harm or hurt anyone of any

25 race or creed?

1    A.    Not at all, no, sir.  To nobody.

2    Q.    And again, while you were on conditions of release in the

3    first iteration of this case, you were fully compliant with

4    those conditions?

5    A.    Yes, sir.

6         MR. ROMERO:  I'll pass the witness, Your Honor.

7         THE COURT:  Okay.  Mr. Mote.

8         MR. MOTE:  May it please the Court.

9         THE COURT:  Go ahead.

10                        CROSS-EXAMINATION

11   BY MR. MOTE:

12   Q.    Senior Airman Justice, you're a senior airman in the Air

13   Force?

14   A.    I am, yes, sir.

15   Q.    And that's an E3, correct?

16   A.    E4.

17   Q.    E4?  Okay, so you're above the E1s and E2s and E3s?

18   A.    That's correct.

19   Q.    So you've been promoted three times?

20   A.    I joined as an E3, sir, and I'm currently an E4.

21   Q.    Now, I'm just an old Marine, so if I use a term that

22   doesn't line up with the Air Force, let me know, okay?

23   A.    Yes, sir, will do.

24   Q.    In my experience, E1s and E2s traditionally stand duty.

25   Is that kind of the case in the Air Force?

A.    Not necessarily.  I know -- I think E4, is that a baby

sergeant in the Marine Corps, I think?  Is that the proper way

to say that?  They used to be in the Air Force.  It's no longer

that way.  So anymore, E4 and below is, I don't want to say

amalgamated to the same rank, but it pretty much is, generally.

Q.    E1s, E2s and E3s all stand duty --

A.    Yes, sir.

Q.    -- is that correct?

A.    Yes, sir.

Q.    And they stand guard and they stand sentry?

A.    Yes, sir.

Q.    And your military training, it's your MOS, Military

Occupational Specialty; that's correct?

A.    Yes, sir.

Q.    And what is that technically?  What is your MOS?

A.    Mine's a 3P0.  And past that point, it's skill status.  So

I'm a 3P051.

Q.    Okay.  And you talked earlier about the weapons training

you've received in the Air Force.  Now, would you say under

your MOS, you've received additional weapons training than the

majority of the Air Force or airmen?

A.    Yes, sir, considering the belt fed weapons, in particular.

But everything else -- a finance member is going to get the

same pistol and rifle training that we do.

Q.    And you talked about your training with the M4 platform;

1  is that correct?

2  A.   Yes, sir.

3  Q.   And that's kind of the same thing as the civilian

4  equivalent of the AR-15, correct?

5  A.   Generally speaking, but there's quite a few distances.

6  Q.   Why don't you please tell me what those differences are.

7  A.   An M4 is shorter, select fire, capable of multiple rounds

8  per pull of the trigger.  It collapses into a smaller profile.

9  It's a generally lighter weapon.  Made by Colt.  It's

10  engineered specifically for longevity, for military service.

11  Metallurgically, it's different.

12  Q.   Okay.  But the AR-15 platform, I think the biggest

13  difference is that only fires in a semiautomatic capacity --

14  A.   Correct.

15  Q.   -- correct?

16  A.   Yes, sir.

17  Q.   But the M16 and the -- or the M4, that can fire in a burst

18  mode, correct?

19  A.   It can.

20  Q.   All right.  And there are certain platforms, variations of

21  it, that can flip to full auto --

22  A.   Right.

23  Q.   -- correct?

24  A.   We don't have those.  But, yes, sir, they are capable.

25  Q.   But the civilian AR-15 is only a semiautomatic --

1   A.    That's correct.

2   Q.    -- is that correct?  But there are ways that you can

3   convert a civilian AR-15 into a fully automatic rifle, correct?

4   A.    It is possible.  It requires some work, but it is

5   possible.

6   Q.    Okay.  And that can be done by filing down the selector

7   switch on the --

8            MR. ROMERO:  Objection, Your Honor.  This is totally

9   beyond the scope.  I never went into the engineering skills of

10  converting a semi-auto to an auto.  I restricted the

11  examination and tried my best to, Your Honor, to the issues

12  that are here before the Court today, which is danger to the

13  community and flight risk.

14           MR. MOTE:  Your Honor, if I may respond.

15           THE COURT:  Yes, go ahead.

16           MR. MOTE:  The issue before the Court is danger to

17  the community and flight risk.  On direct examination, Senior

18  Airman Justice was examined on his training on military

19  weapons.  He was also examined on the contents that were

20  located on his phone, and I will get into that here in a

21  moment, Your Honor, what exactly was located on his phone.  But

22  part of what was located on his phone were plans and means for

23  which Senior Airman Justice could convert an AR-15 that he

24  could find on the street into a fully automatic weapon.  So I

25  think that's definitely relevant for this Court's determination

1  on safety of the community, and the door was opened wide open

2  by defense counsel on direct examination.

3          MR. ROMERO:  Your Honor, I never discussed a specific

4  download, a specific plan.  Whatever he downloaded was stuff

5  that is available publicly on the web.  And the

6  characterization that he downloaded some plan to convert a

7  weapon from semi-auto to auto, and that he did it with a plan

8  to do so, is complete hyperbole, speculation, and jumping to

9  conclusions.  Anybody can get on the web and type a recipe for

10 converting this weapon to that weapon.  That's not what this

11 hearing is about, Your Honor.

12          The social media -- in terms of his weapons training,

13 he's received the same basic weapons training that everybody in

14 the military pretty much receives, and if that's the standard

15 for danger to the community, then anybody and everybody who has

16 served in the military would be found to be a danger to the

17 community.  I just think we're going way off of field into an

18 area that I kept limited to, did he download these specific

19 posts that had to do with alleged racist, Islamophobic

20 positions.  I didn't get into and did not discuss downloads

21 having to do with converting, or his alleged plans to convert

22 some weapon from semi-auto to auto.  That was never brought up.

23          THE COURT:  I'm going to allow you to inquire about

24 his reasons for doing the various downloads and collecting a

25 rather massive number of weapons.

1     MR. MOTE:  Thank you, Your Honor.

2     THE COURT:  You can get into that.

3     MR. MOTE:  Thank you, Your Honor.

4  BY MR. MOTE:

5  Q.  Senior Airman Justice, as I was saying, there are ways

6  that you can convert a civilian AR-15 semiautomatic rifle into

7  a fully automatic rifle; is that correct?

8  A.    I believe so, according to what you see online, yes, sir.

9  I've never done it.

10 Q.    And in addition to what I could see online, you had

11 photographs of plans and methods for how you can convert an

12 AR-15 into a fully automatic rifle on your phone, correct?

13 A.    What you call plans and methods, I call schematics.

14 Again, you mentioned E4, and as I mentioned, we used to call

15 buck sergeant --

16 Q.    The question that I asked you was, did you have plans or

17 schematics, in your own words, of how to convert an AR-15

18 civilian semiautomatic rifle into a fully automatic firearm on

19 your phone?

20    MR. ROMERO:  Objection, Your Honor.  Can he answer

21 the question?  He was interrupted mid answer.

22    MR. MOTE:  Your Honor, I'm merely asking the witness

23 to answer the question.

24    THE COURT:  Well, let's get the record straight here.

25 Why don't you proceed with the questions you want to ask.  Your

1 objection brings up matters that you can cover on redirect.

2 Let's do it that way.  You can go ahead.

3        MR. MOTE:  Thank you, Your Honor.

4 BY MR. MOTE:

5 Q.   Senior Airman Justice, as I was saying, did you have

6 photographs or schematics, using your own words, of how to

7 convert a semiautomatic rifle, AR-15, into a fully automatic

8 rifle on your phone?  "Yes" or "no."

9 A.   Yes, those do exist.

10 Q.   Thank you.  You also indicated that you had training with

11 the 240, 249, and those are belt fed fully automatic weapons,

12 correct?

13 A.   They are.

14 Q.   And you also had a photograph of a belt fed fully

15 automatic weapon downloaded to your phone, correct?

16 A.   Yes, sir, but there's more attached to that one that I

17 think you should cover.

18 Q.   Please tell me, what else was attached to that?

19 A.   It's a political statement.  It shows the belt fed

20 firearm, and then it shows a marijuana leaf underneath it.  I

21 know that's a big point of contention in our country right now.

22 Q.   What else did it say on that photograph?

23 A.   It says, "In a free country, you can own both."

24 Q.   Okay.

25 A.   Just a political statement.

1  Q.   But in this country, you cannot, as a civilian, own a belt

2  fed weapon; is that correct?

3  A.   You can, yes, sir.

4  Q.   And how do you do that?

5  A.   You have to apply for a Special Occupation Tax license, an

6  SOT license.  There are various methods --

7  Q.   Does --

8        MR. ROMERO:  Can he answer his question, Your Honor?

9        MR. GONZALES:  Hold on, hold on.  You all have to

10  stop talking over each other because the court reporter is not

11  going to be able to get everything.  So don't start talking

12  over each other.  Let each other finish your sentences.

13        THE DEFENDANT:  Yes, sir.

14        MR. ROMERO:  Your Honor, if I may, with regard to my

15  objection, Mr. Justice was in the middle of his answer when he

16  was interrupted.

17        THE COURT:  I understand, and Mr. Gonzales has

18  pointed out to everyone that you need to be respectful of the

19  court reporter, in particular.  She cannot take down multiple

20  voices that are speaking simultaneously.  So I'll ask that the

21  person asking the question be able to complete the question

22  before an objection is interposed, and that the witness not

23  start responding to a question before the question is stated

24  completely.

25        So let's go ahead with the next question.  Wait for

1  the witness's answer to it.  If there's an objection to it, you

2  can state the objection after the question.  Go ahead.

3         MR. MOTE:  Yes, Your Honor.  If I may, with the

4  Court's permission, I would like to fire up the Elmo and just

5  display that photograph.  I think that would assist us in that.

6         THE COURT:  Go ahead.

7  BY MR. MOTE:

8  Q.   Senior Airman Justice, can you see the photograph that I

9  have displayed on the Elmo there?

10 A.   No, it's blacked out right here.  Now I can, thank you.

11        MR. MOTE:  And just for the Court's record, what I am

12 displaying is Document 23-1, Page 3 of 44 on the Elmo here.

13 Q.   Senior Airman Justice, the photograph that we were just

14 referencing before the objection is the photograph displayed on

15 the right side of the screen, correct?

16 A.   It is that photograph, yes, sir.

17 Q.   Okay.  And what is that a photograph of?

18 A.   Some belt fed machine gun, I'm not aware of which type,

19 and whether it's real or fake, I can't tell you, above a

20 picture of what appears to be a marijuana leaf.

21 Q.   Okay.  Both of which are, other than if you apply and

22 receive a specific ATF license, both of which are illegal to

23 possess, correct?

24 A.   That is correct.

25        MR. MOTE:  I'm removing the photograph from the Elmo

1  here, but with the Court's permission, I'd like to keep it

2  fired up in case we need to address additional photos, Your

3  Honor.

4          THE COURT:  All right.

5          MR. MOTE:  Thank you.  While we're here, Your Honor,

6  since I've got this fired up, I'll just go ahead and flip

7  through a couple of these photographs that I had planned to ask

8  questions about.

9  BY MR. MOTE:

10  Q.   Senior Airman Justice, can you still see that page that we

11  were just talking about?

12  A.   I can, yes, sir.

13  Q.   And what is that photograph on the left side of the screen

14  of?

15  A.   That is the bed of my pickup with a good friend of mine.

16  It's black and white and kind of terrible to see over here, but

17  it's of several firearms that I personally own in the bed of

18  that pickup truck.

19  Q.   So those are your firearms?

20  A.   Yes, sir.

21  Q.   And what is this picture?  I've flipped over one page to

22  Page 4 of 44 of the same document.  What is this picture on the

23  left?

24  A.   That is a picture of a gentleman that used to work at my

25  unit.  I do not know where he's at now.  In or out of the

1  military, I can't tell you.  And he is holding up a rifle with

2  what appears to be a suppressor attached.

3  Q.    Okay.  And the suppressor that you're referencing, that's

4  what's on the end of the firearm, correct?

5  A.    That's what it appears to be, sir.  Really, it's almost

6  like all black on my screen.

7  Q.    Did you take that photograph?

8  A.    No, sir.

9  Q.    But it was saved to your phone?

10  A.    I don't know, sir, if it was or was not.

11  Q.    Have you reviewed the phone rip that was done of your cell

12  phone?  Have you reviewed the extraction, the contents of your

13  phone?

14  A.    I believe so, sir.  I'm confused what you're referring to.

15  The phone rip?

16  Q.    The extraction of the data from your telephone.

17  A.    No, sir, I don't believe so.

18  Q.    You have not had an opportunity to review that?

19  A.    I do not think so, no, sir.

20          MR. MOTE:  Let me have a moment, Your Honor.

21  BY MR. MOTE:

22  Q.    Senior Airman Justice, you just talked about a minute ago

23  the possibility of converting a civilian AR-15 into a fully

24  automatic weapon; is that correct?

25  A.    That is correct.

1  Q.    Okay.  I'm displaying more photographs, which it was

2  previously testified in the previous hearing that they were

3  extracted from your telephone, and these were saved to your

4  telephone.  I'm looking at Page 7 of 44 there, Document 23-1.

5  What is that on the left and the right side of the screen?

6  A.    The left side, I can't tell.  It looks like a bunch of

7  numbers and lines.  I can't tell you what it is.  Again, me

8  being a hobbyist, I don't dabble with this kind of stuff, you

9  know.  It's a curiosity, but not something I take an active

10 pursuant interest in.

11      The right-hand side, once again, I can tell the bottom

12 right-hand picture -- I'm just familiar with the bottom

13 right-hand picture, because I'm familiar with the AR platform.

14 I can tell you that's an AR.  But the pictures above it, I

15 can't tell you exactly what they are.

16 Q.    Senior Airman Justice, under oath today, is it your

17 testimony that you did not download these photographs to your

18 telephone?

19 A.    No, it's possible that I downloaded them, but the

20 knowledge of what they are, I don't really know.  And they also

21 could have been part of a mass download.  Quite often pictures

22 that you find, or PDFs that you find like this, they're all

23 compiled together.  So if you've been searching for one

24 particular picture, you get on Google Images, of course they're

25 public, you go to the public image, and then you go to the

1  page where that public image is found, and that page links back

2  to like a PDF.  So these could have been a part of a bucket of

3  download that happened at a simultaneous time, you know, at the

4  same time frame.

5  Q.   Is it your testimony today that you downloaded these

6  photographs to your telephone, but you're not sure if you've

7  ever looked at them?

8  A.   Correct, yep.

9  Q.   Are you familiar with the term lightning link?

10  A.   No, sir.

11  Q.   I'm removing the photograph from the screen.

12       Senior Airman Justice, earlier you testified under oath

13  about your Instagram and your Facebook use; is that correct?

14  A.   Yes, sir.

15  Q.   And you stated that sometimes profiles, Instagram

16  profiles, can pop up on your screen based on communications

17  that you have with others, correct?

18  A.   Correct.

19  Q.   Okay.  And you testified that it's possible that these

20  photographs ended up on your phone without you downloading

21  those photographs, correct?

22  A.   That is correct.

23  Q.   It's possible that you were able to, just by being on

24  Instagram and the folks that you were linked with, that these

25  photographs appeared on the Instagram application based on your

1  linkage to these people, correct?

2  A.   My feed, I guess is what you would call it.

3  Q.   That's a great term, yes.  So these showed up on your feed

4  possibly just based on links?

5  A.   Based on, yeah, interactions with other members that may

6  have interacted with that post.

7  Q.   Okay.  Senior Airman Justice, these were found in your

8  saved photographs.  So is it your testimony today that you did

9  not screen-shot and save those photographs to your telephone?

10  A.   There's quite a few of them that probably I did absolutely

11  download, but there's some other ones that I do not recognize

12  whatsoever, so I cannot testify that they were on my phone or

13  that I ever viewed them, or anything else of that nature.

14  Q.   Do other people download photographs onto your phone?

15  A.   Not that I'm aware of, no, sir.

16  Q.   Okay.  And in order to -- it sounds like you're a

17  technological guy.  In order to save photographs from Instagram

18  to your phone, you have to take an affirmative action to get

19  those photographs into your photo album, correct?

20  A.   There's probably a multitude of ways, but that's probably

21  the most, in layman's terms, like regular way to do it, I would

22  suppose, yes, sir.

23  Q.   Thank you.

24  A.   I'd hesitate to call me tech savvy.

25  Q.   Thank you.  Did you also have a bug out list, or a bug out

1  plan saved to your phone?

2  A.    It was.  It was just a general preparation list.

3  Q.    What did you call that?

4  A.    Preparation list, I suppose is what I would call it.  I

5  don't remember the title of the exact list.  But it wasn't made

6  with any intention of, you know, a particular catastrophe being

7  in mind.  Just a general, you know, cover-all, I suppose.

8  Q.    Kind of a list of materials that you would need if you

9  needed to bug out or leave out quickly?

10  A.    Yes, sir.  But also in that document, it also did

11  include -- in fact, it said, assemble this list even if staying

12  in, to indicate, you know, preparation for a possible pandemic,

13  or possible rioting and looting, which we're seeing actively

14  today.

15  Q.    Okay.

16  A.    I think it's just a military behavior.

17  Q.    As a part of your training, have you ever undergone SERE

18  training?

19  A.    No, sir.  The only SERE training we do is all

20  computer-based training or CBT based.  We do go through SERE

21  training, but it is a very quick and brief, like I said,

22  digital, computer-based training.

23  Q.    Okay.  And what is the purpose of that training?

24  A.    A lot of things, I believe.  One of them being just to

25  vary your routes going home.  You're a valuable member, so

1  you're being monitored by third parties, or could be.  With the

2  assets I work with, maybe you're at increased risk of being

3  monitored, things of that nature.  Just to mind your Ps and Qs,

4  be prepared, have a plan, stuff like that.

5  Q.   Learn how to survive and evade if you need to, correct?

6  A.   I don't know.  That's more hands-on stuff.  A lot of this

7  is just general when you're in the store, you know, if the same

8  gentleman is following you 15 aisles in a row, it's probably

9  not a good sign, stuff like that.  But not like surviving and

10  evading in the woods or anything like that.  No, that's not

11  covered with the computer.

12  Q.   Okay.  Your attorney earlier questioned you and he talked

13  a bit about the pretrial confinement hearing that took place on

14  Kirtland Air Force Base.  Now, that is totally separate to the

15  charges that you're facing here today.  Can you please explain

16  the charge for which you were charged under the military

17  justice system?

18  A.   So, at the time, the pretrial release hearing was the same

19  exact charges.

20  Q.   Okay.  And that took place seven days after your arrest,

21  is what you testified to earlier?

22  A.   The 26th of February, yes, sir.

23  Q.   And the extraction of your phone that uncovered this mass

24  of materials did not occur until after this hearing had taken

25  place, correct?

A.    I'm not aware of the exact date, no, sir.

Q.    Okay.  But the date of the hearing you said was seven days after your arrest?

A.    It was seven days, yes, sir.

Q.    Okay.

      MR. MOTE:  Your Honor, if I may have a moment to confer with co-counsel.

BY MR. MOTE:

Q.    Have you ever discharged a firearm in housing on Kirtland Air Force Base?

A.    No, sir.  A test shot was done with a blank, but not discharged with a projectile, no, sir.

Q.    But you discharged a firearm?  It might have been a blank round, but you discharged a firearm in base housing on Kirtland Air Force Base, correct?

A.    That is correct?

      MR. MOTE:  Your Honor, no further questions.  Thank you.

      THE COURT:  Go ahead, Mr. Romero.

      MR. ROMERO:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. ROMERO:

Q.    Sir, after your pretrial confinement release hearing, is it fair to say from discussions you had with your counsel and other people present that the OSI office was not happy with

1  your being released?

2  A.   That is correct, sir.

3  Q.   And after your release, CYFD or Family Advocacy came and

4  did a parental termination investigation with regard to your

5  one-year-old child; is that correct?

6  A.   In fact, both did at separate times, yes, sir.

7  Q.   And after CYFD and the military Family Advocacy did a

8  review and investigation of your competency as a parent, what

9  did they determine?

10  A.   Completely unfounded.  Both departments, same result.

11  Q.   Okay.  Now, there's a lot of reference to photos and

12  schematics that were downloaded, either individually or as part

13  of a PDF larger dump of documents when you do such downloads.

14  As far as you know, were you committing any crime that you were

15  aware of when you did, if it was you that downloaded some of

16  these photos or schematics that are referenced?

17  A.   No, sir.

18  Q.   So with reference to some of this information, does it

19  again relate back to your interest in knowing about firearms

20  and being a firearms hobbyist?

21  A.   It does, yes, sir, and the fact that I like to educate the

22  others that I work with.  I think that's a big point of it, as

23  well.

24  Q.   And with regard to the -- a long time ago I was in the

25  military, and we would talk about prep and bug out.  Tell the

1  Court a little bit more about what the military teaches about

2  bug out and prep, and whether it's something unique to you and

3  this case or it's something that's more widely taught in the

4  military.

5  A.    Funny enough, I think it's both, to a degree.  I think

6  everyone in the military is taught, you're a prime target in an

7  ever-changing world, considering terror groups and things like

8  that.  You know, the people that want to watch you, watch your

9  routes, watch what you do, what do you know.

10      Myself, more importantly, because of the assets I work

11  with, we get regular OSI briefings every six months, I believe,

12  updates to the threat level of the general area and things of

13  that nature.  I know we, as what we call nuke cops, are a

14  little higher on the target list just because of what we work

15  with, what do we know, and so it's more common to find people

16  like myself, people that I work with, to just be more mindful

17  of preparing for eventualities, I guess.

18  Q.    This bug out reference and having the bug out list, is

19  that consistent or inconsistent, and part of or not part of

20  your general military training?

21  A.    I think it's totally consistent.  It is not a requirement,

22  but I think it would be absolutely consistent to say that the

23  majority would have some sense of planning like that.

24          MR. ROMERO:  May I have a moment, Your Honor?

25          THE COURT:  Yes, you may.

BY MR. ROMERO:

Q.   So when you were released on conditions and compliant on conditions of release, where were you working?  Where were you assigned?

A.   I was assigned, as an alternate duty assignment, at the chapel on base, the church.

Q.   So you were, while your military case was pending and you were on conditions of release, you were not allowed to return to your previous or regular job of being, excuse the terminology, a nuke cop?

A.   That's correct, yes, sir.  I don't know if I was barred, but I just know that I was given an alternate duty assignment.

Q.   And you reported for duty as required?

A.   Every day, yes, sir.

Q.   Okay.  And have you ever posted or discussed any kind of sympathies or being a member of any white nationalist or Islamophobic association or group?

A.   Not in the slightest, no, sir.

Q.   And again, with regard to the manifesto that's referenced quite a bit, is that something that's publicly available and downloadable on the web?

A.   It is.  That's how I got it, yes, sir.

Q.   And are you aware and do you know other service members who have downloaded the same manifesto?

A.   At the time that the event occurred, sad to say, but we

1 did, a lot of us did download it.  We took it upon ourselves, I

2 guess, to take it very seriously.  I don't know if they still

3 do or not, but they did.

4 Q.   And again, was the intent to do any harm to Muslims or

5 Muslim Americans?

6 A.   Not at all, no, sir.

7        MR. ROMERO:  Thank you.  I have no further questions.

8        THE COURT:  Let me ask a few question, and counsel

9 can follow-up if need be.

10        When I read the Pretrial Services Report, it stated

11 that your wife, Beatrice Ottomanelli, indicated she is unable

12 to serve as a third-party custodian because she has plans to

13 move back to Melbourne with your son.  Does your wife still

14 live in Albuquerque, or where does she reside now?

15        THE DEFENDANT:  No, sir, she left four days after I

16 was arrested federally, and she is in Melbourne, Florida, with

17 her parents.

18        THE COURT:  The report from Ms. Day, who is

19 participating in this hearing, dated yesterday, says that the

20 Defendant did not contact the Pretrial Services Office to give

21 any new information or request the vetting of a potential

22 third-party custodian, and then they conclude that without any

23 new information, there does not appear to be any combination of

24 conditions that will reasonably assure the appearance of the

25 Defendant at court, or ensure the safety of the community.  Do

1  you have in mind a custodian who would be responsible for you

2  if you were to be released?

3          THE DEFENDANT:  Sir, I've got several candidates,

4  people that I would think -- people that I've served with in

5  the past.  I can't contact them, because I don't have their

6  phone numbers, so I've entrusted my wife with that.  I talked

7  with her yesterday.  She was supposed to get in contact with

8  those four individuals, and I have not contacted her past that

9  point to find out if that was --

10          THE COURT:  Are those four individuals people who

11  reside in Albuquerque?

12          THE DEFENDANT:  Yes, sir.  They all reside either on

13  the installation or off the installation, but all within

14  Albuquerque, yes, sir.

15          THE COURT:  All right.  Counsel, go ahead.

16          MR. ROMERO:  Your Honor, if I may, just one quick

17  follow-up on the Court's question.

18          THE COURT:  Go ahead.

19          MR. ROMERO:  Your Honor, my understanding, and one of

20  the reasons I know Mr. Justice has been in regular contact with

21  his wife -- and we advised her not to get on a plane to come

22  here because of the virus, and they have the one-year-old

23  child.  But according to Captain Saulter, and he could address

24  this, he has the pending military justice proceeding, and one

25  of the conditions, if he were to be released here, would be

1    that he would likely be returned to base.

2         He was basically -- he has already reached his, I

3    think they call it an EPS, his termination of his service

4    contract, and he has been held back by the military in order

5    for them to finalize and process the UCMJ case that is pending

6    against him at the same time or concurrent with this case.  And

7    according to Captain Saulter, what would happen, or he believes

8    would happen -- and he could address the Court more

9    specifically -- is he would be returned to base in a dorm

10   facility there, because he, as a result of being retained by

11   the military for processing of the UCMJ action that's pending,

12   they basically own him, in terms of being required to provide

13   for him and have a room and board for him, Your Honor.

14        THE COURT:  Who would be his custodian in the

15   dormitory circumstance?

16        MR. ROMERO:  Your Honor, I think that would all be a

17   function of the chain of command in terms of putting conditions

18   in place.  But if I may, if I could have Captain Saulter

19   address that as the SME, or the Subject Matter Expert with

20   regard to that issue.

21        THE COURT:  Sure, that's fine.

22        MR. MOTE:  Your Honor, I would object to this

23   individual providing testimony without being subject to

24   cross-examination.  If he's going to testify about the

25   conditions under which the accused would be placed if he landed

1 back in military custody, Your Honor, then I would request an

2 opportunity to cross-examine him on his opinions on that.

3         THE COURT:  Sure, you will be.

4         MR. ROMERO:  And we have no objection, Your Honor.

5 Captain Saulter got express permission from his chain of

6 command to testify at this proceeding as a witness if

7 necessary, Your Honor.

8         THE COURT:  Let's go ahead and finish with

9 Mr. Justice's testimony.  Go ahead.

10         MR. MOTE:  Thank you, Your Honor.

11                 RECROSS-EXAMINATION

12 BY MR. MOTE:

13 Q.   Just briefly, have you been disciplined since you've been

14 in jail?  Have you been disciplined by the jail for getting a

15 tattoo?

16 A.   No, sir.

17 Q.   You testified on redirect with your defense counsel that

18 you had never discussed sympathies with any white nationalist

19 or racist movement; is that correct?

20 A.   Yes, sir.

21 Q.   Is it your testimony under oath today that you have never

22 communicated with a person using the Instagram name Free Rope

23 Rides?

24 A.   I don't know who that person is, sir.  Evidently there's

25 multiple pages, because I've seen the headlines, so I don't

1 know which one you're referring to.  There's a multitude of

2 pages.  You're indicating there's a Free Rope Rides 3.  I've

3 seen that indicated in the photos.  I don't know, but in that

4 case there's probably a 1 and a 2 somewhere.

5 Q.   Okay, hold on.

6          MR. MOTE:  Your Honor, if I may have a moment.

7 BY MR. MOTE:

8 Q.   And under oath today, have you ever communicated with

9 anyone that has Free Rope Rides in the Instagram profile title?

10 A.   Communicate as in how, sir?  Liking a post?  Commenting on

11 a post?  Interactions?

12 Q.   Let's walk through those one by one.  One, have you ever

13 liked any of their posts?

14 A.   To be honest, I don't know.  I don't know.

15 Q.   Two, have you ever screen-shotted any of their posts?

16 A.   Again, I don't know.  It's been so long since I've had a

17 phone, so I don't remember.

18 Q.   Three, have you ever sent any messages via Instagram or

19 Facebook to someone with that profile name?

20 A.   It's possible I did, possibly not.  I don't remember,

21 honestly.  I do not recall.

22 Q.   Okay.

23          MR. MOTE:  No further questions.  Thank you, Your

24 Honor.

25          THE COURT:  Mr. Romero, do you have any further

1  questions?

2          MR. ROMERO:  No, Your Honor, I don't.

3          THE COURT:  Okay.  Thank you, Mr. Justice, you may

4  have a seat back at the table.

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Okay, Mr. Romero, call your next witness.

7          MR. ROMERO:  Captain Saulter.

8          THE COURT:  Please come forward and be sworn as a

9  witness.

10          THE WITNESS:  Thank you, Your Honor.

11          (ROBERT W. SAULTER, DEFENSE WITNESS, AFFIRMED)

12                  DIRECT EXAMINATION

13  BY MR. ROMERO:

14  Q.   Captain Saulter, just for the record, please if you could

15  state your full name and your title and where you're assigned.

16  A.   Yes.  My name is Robert, W. is my middle initial, Saulter.

17  Sierra Alpha Uniform Lima Tango Echo Romero.  I'm a captain in

18  the United States Air Force.  I'm stationed at Kirtland Air

19  Force Base as the Area Defense Counsel.

20  Q.   And in that capacity, when did you meet Charles Brent

21  Justice?

22  A.   Roughly around the time of his arrest in February.

23  Q.   Okay.  And if you could, briefly summarize those initial

24  charges, or I think in the military they're called

25  specifications.

A.    There are both charges and specifications.  So in the
military system when you have a federal crime, a federal
civilian crime that's not particularly outlined in the Uniform
Code of Military Justice, it can be captured under Article 134
of the UCMJ and assimilated essentially under that provision.
And at the pretrial confinement hearing, the silencer at issue,
the silencer allegation, anyway, was one of the charges that
were examined by the Pretrial Confinement Review Officer.

Q.    So they assimilated the Title 18 offense for which he is
here today?

A.    Yes.  And under the military system, you don't have to be
formally charged to be at a pretrial confinement hearing.  So
essentially, it's a rough estimation of the charges.  They read
it out.  But the actual referral of charges, which is what in
your system you would consider the indictment or criminal
complaint, that doesn't come until potentially later.

       So at that time, they did reference those charges.  It was
part of what was in front of the hearing.  But he wasn't
formally charged with anything until much later.

Q.    Okay.  And you represented the Defendant at his pretrial
confinement hearing?

A.    Yes, I did.

Q.    You sat here and listened to his recitation of the
findings made by the commander.  I believe it was Colonel
Carlson; is that right?

1   A.   Yes, sir, it was Colonel Carlson, who I believe is the

2   377th Maintenance Group Commander, MXG.   He has been appointed

3   by the base, the Wing Commander, Colonel Miller, to be the

4   Pretrial Confinement Review Officer.   Not specifically for

5   Airman Justice's case, but for all cases where someone might be

6   placed in a pretrial confinement.

7   Q.   And after hearing all the evidence adduced by the command

8   in support of their request for continued detention,

9   Colonel Carlson found that he should be released, the

10  Defendant?

11  A.   Summarily from the bench.

12  Q.   Okay.   And just briefly, since we have you here, was the

13  command upset about that?

14  A.   Yes.

15  Q.   And how do you know that?

16  A.   I talked to them right after the hearing.   Both the

17  Lt. Colonel Commander and the First Sergeant had testified, as

18  well as several OSI agents, in hopes of having Senior Airman

19  Justice retained in pretrial confinement.

20  Q.   And I'm asking you under oath, in your opinion, did the

21  witnesses on behalf of the command testify inaccurately or

22  falsely with regard to their attempt to keep Defendant Justice

23  detained?

24  A.   If I could ask you just to repeat that one more time.

25  Q.   Well, there was a reference to Wish.com; is that correct?

A.    Yes.

Q.    Tell the Court about that.

A.    So, part of what was at issue at the pretrial confinement hearing was the search of Airman Justice's house, and pursuant to that search, there was an affidavit for probable cause. They wanted to search his house and every little nook and cranny, so they said in the affidavit that there was some evidence that he was using the dark web and cryptocurrency to import things from China.

     At the pretrial confinement hearing, the agent that testified regarding that confirmed that they were aware of Wish.com, and that Wish.com is an American website and that it is not part of the dark web.

Q.    Just to clarify, in the affidavit they indicated that he was utilizing a dark website and cryptocurrency in support of the search warrant?

A.    Correct.

Q.    And it turned out that Wish.com was the website at issue, and it is not a dark website, correct?

A.    Correct.  Like many American-based websites, they fulfill orders with parts from China and other countries, but it is in no means a website like Silk Road or other dark websites where you can purchase illicit materials.  I'm sure you can purchase something illegal on Amazon, but it doesn't make it a dark website.

Q.   And then with reference to the search, itself, was there an issue that came up during the hearing that you testified at regarding the proximity of the lawfully owned or purchased firearms to toys?

A.   Yes.  So at the hearing, one of the agents that testified was shown several photos of firearms next to plastic children's toys, and there was an illusion made that that's where those firearms were kept and that the child was somehow in danger. On cross-examination, the agent admitted that he had placed those firearms next to the plastic toys to make them look worse.

        MR. STANFORD:  Your Honor, we are fairly far afield of danger to the community and flight risk at this point.

        MR. ROMERO:  I'll move on, Your Honor.

        MR. STANFORD:  I'm confused as to what we're talking about.

        THE COURT:  Mr. Romero is going to something else, I guess.

        MR. ROMERO:  I'll move on, Your Honor.

BY MR. ROMERO:

Q.   I believe once you secured, after the hearing, Mr. Justice's release, is it your understanding based on your contact and communication with him that he was in full compliance with those conditions of release?

A.   One hundred percent.

1  Q.   And he stayed in contact with you?

2  A.   Yes.  Without revealing any client confidential

3  communication, we prepared for his case.  I communicated with

4  both him and his wife about the pending CYFD issues that had

5  been brought.  I helped him prepare for the expiration of the

6  term of his service.  So there was plenty of coordination going

7  on between us, as well as the fact that his wife was

8  considering going to Florida because of the expiration of his

9  term of service.

10  Q.   Should the Court in this case fashion conditions of

11  release for the Defendant, what would that possibly or likely

12  entail with regard to what would occur to him in the pending

13  military case?

14  A.   So, he's still pending military charges.  There was a

15  preliminary hearing a couple of weeks ago that concluded.

16  There's currently a probable cause determination that's yet to

17  be found.  That should be coming this Friday.  But assuming

18  that the Government chooses to go forward with those charges,

19  they would put him on an administrative hold that would

20  indefinitely extend his enlistment in the military, and then he

21  would be moved back to Kirtland Air Force Base.

22       Several of his friends testified at the pretrial

23  confinement hearing, and I'm certain one of them would likely

24  allow him to live in their house, or else he would be given a

25  dorm room, would be my next guess.  I have several clients

1  under these kind of circumstances, not because they're being

2  restricted to the dorms, but they are offered the opportunity

3  to utilize the dorms if they give up their BAH, which he's

4  currently not getting paid at all.

5  Q.   And if he were to leave at any time from the base, or

6  return in an unauthorized manner, would that, given the

7  security posture of the base, would that be something that

8  would be able to be documented or verified?

9  A.   Absolutely.  Again, I have roughly 300 clients on the base

10 facing a variety of charges, plus another 20 or 30 bases across

11 the Air Force.  Essentially -- I even have one client that's

12 coded as a deserter.  But they will find you wherever you go.

13 When I was a prosecutor, somebody tried to go to Canada and

14 seek asylum, which didn't work out too well.

15     But, yes, they will find you anywhere in the world that

16 you go, and it will be noticed.  He does have to report to work

17 every single day and will be maintaining accountability, just

18 like any other member, and probably even more so.  As a lot of

19 my clients are pending charges, the unit is very active in

20 making sure they have accountability on those members.

21 Q.   So finally, as a military member, somebody who has been

22 put on administrative hold and retained in the military pending

23 the final processing of the UCMJ proceeding, he would be

24 required to work, report to work, stay likely at a base dorm or

25 base housing, and accountability would be verified through that

1  process; is that fair?

2  A.  Yes, just like all of my other clients, yes.

3         MR. ROMERO:  Pass the witness.

4         THE COURT:  Let me ask another question.  What if

5  Mr. Justice is convicted of the military charges?  What happens

6  then?

7         THE WITNESS:  Just because he's convicted -- the

8  charges that he's facing do have a potential for a punitive

9  discharge, but I wouldn't say that they -- they do not have --

10  we don't have minimums.  Most of my clients do not receive

11  punitive discharges, which typically means that they serve any

12  confinement time they might have, they go back to their unit,

13  they in-process, and then either they're administratively

14  discharged, or in this case because Airman Justice has already

15  reached his EPS, he would essentially be out of the military

16  once those charges are resolved.

17         But I have cases where military members are held two

18  or three years for their court-martial on administrative holds.

19  They can extend them as long as they want.

20         THE COURT:  Well, if he's convicted of the military

21  charges, what is the maximum punishment?

22         THE WITNESS:  Depends on the forum.  Currently the

23  preliminary hearing officer, which is a neutral JAG that

24  presided over the hearing a few days ago, can recommend a

25  forum.  The charges that Airman Justice are facing, since the

1  silencer NFA charges were removed, are charges that I think

2  it's very possible will be a recommendation for a special

3  court-martial, which is essentially a misdemeanor level offense

4  with a one-year maximum.

5       I think if you actually add up the maximum

6  punishments, if it's at a general court-martial -- I don't want

7  to speak too far out of turn, but the violation of an order, I

8  believe that you have three months or six, and then the stolen

9  property ones are a couple of years, depending on how that

10 plays out, because it's military property.  But that's at

11 issue, as well.  I think there's a good chance that at least

12 one of those charges will be found to not have probable cause

13 when the report drops on Friday.

14          THE COURT:  Go ahead.

15          MR. MOTE:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17 BY MR. MOTE:

18 Q.   Captain Saulter, good afternoon.  How do you pronounce

19 your last name?

20 A.   Saulter, like pepper.

21 Q.   Okay.  I just wanted to make sure I was doing that

22 correctly.

23      Captain Saulter, just before we go any further, you

24 testified a minute ago that the maximum punishment for an

25 violation, the order violation, is three or six months.  Is

1   there anything that could help you be a little more sure about

2   your answer on that?  Would viewing the maximum punishments

3   table in the UCMJ help you with that?

4   A.    Depends on if that's the 2016 or the 2019 version.

5   Q.    This is the 2019 version.

6   A.    That would be helpful.

7   Q.    Okay.

8          MR. MOTE:  Your Honor, may I approach the witness?

9          THE COURT:  Yes.

10         MR. MOTE:  All right.

11         THE WITNESS:  I rarely see these in courts-martial.

12         MR. MOTE:  Just for the Court's record, I have handed

13   the witness a copy of the 2019 UCMJ, which includes a max

14   punishment table there.

15         THE WITNESS:  So I see here where you underlined two

16   years, but that's for a general order regulation.  I want to

17   say that he's charged with failure to obey a lawful order,

18   which is six months.  I could be wrong on that, though.  I

19   haven't looked at his charge sheet.  I work with too many

20   clients.

21         MR. MOTE:  Okay.  May I approach the witness to

22   retrieve?

23         THE COURT:  You may.

24   BY MR. MOTE:

25   Q.    Captain Saulter, you talked a lot about the possibilities,

1 and the possibilities of what would occur to Mr. Justice if he

2 is released from confinement and returned to military control.

3 If he is returned to military control, would you agree with me

4 that he would be the responsibility of the commanding officer

5 of his unit and/or the base?

6 A.   Correct, unless he goes to confinement.  Then he's owned

7 by the Air Force Security Forces Center.

8 Q.   Okay.  But that's a totally different determination.  If

9 this Court releases him, he would go back to the control of the

10 commanding officer of his unit or the commanding officer of his

11 base, correct?

12 A.   Correct.

13 Q.   And have you spoken with the commanding officer that would

14 be in charge of him if he were to be released today about his

15 willingness to serve as a third-party custodian?

16 A.   I would not have asked his commander that question, as a

17 third-party custodian, given that there were other potential

18 options.

19 Q.   Okay.  And it's fair to say that if Senior Airman Justice,

20 let's say, is released back to military control and he were to

21 go out and do something, that the responsibility of him,

22 though, would fall onto the commander of his unit or the base,

23 correct?

24 A.   I think everyone in his chain of command, yes.

25 Q.   Okay, thank you.  So he has not been made aware of your

1  request to release him back to military control, the commanding

2  officer?

3  A.   He has many times over.  I have submitted probably 50

4  requests to have the prosecutions here that are concurrent be

5  brought together so that he would be either released from the

6  military or released out of detention.

7  Q.   Right, but that wasn't the question I asked, Captain

8  Saulter.  It was, is he aware that you are here today asking

9  the Court to release him back to military control?

10 A.   Not here today, but generally, yes.  I have talked to him

11 specifically about releasing him to military control.

12 Q.   Okay.  And there are things within the UCMJ, methods of

13 pretrial restriction, right?

14 A.   Correct.

15 Q.   Different ones, and that's what is Article -- what is it?

16 R.C.M. 304?

17 A.   Yes.  That's pretrial restraint, generally.

18 Q.   Pretrial restraint.  But that determination has to be made

19 by the commanding officer, correct?

20 A.   A commanding officer, not necessarily the -- but, yes, a

21 commanding officer.

22 Q.   So if the Court were to release him today, it's up to the

23 commanding officer to determine what level of restriction he

24 places on Senior Airman Justice, correct?

25 A.   To his chain of command, yes.

1  Q.    Okay, thank you.  And in that same vein, when we're

2  talking about pretrial restrictions, usually that requires a

3  military member to have constant supervision.  Is that fair to

4  say?

5  A.    Not necessarily.  So sometimes, like with Airman Justice,

6  you go to an alternate duty location, or I've had clients that

7  had to do once-a-day text ins, and I've also had clients that

8  are restricted to base, but they're not required to check in

9  with anyone.

10 Q.    So differing levels of control when you talk about some

11 semblance of pretrial restriction, there are different levels

12 of control?

13 A.    There can be.

14 Q.    Okay.  Now, anybody that's been on a military base knows

15 that when you go on the military base, usually you have to show

16 an ID to get onto the base, correct?

17 A.    Correct.

18 Q.    Do you have to do any of that when you leave?

19 A.    No.

20 Q.    Okay.  Now, Captain Saulter, you testified that you're

21 the -- is it the Area Defense Counsel?

22 A.    Yes.  I've actually been kind of in limbo right now.

23 Because of the COVID stuff, I'm supposed to be a Circuit

24 Defense Counsel, which is a supervisory position for that.

25 But, yes, right now I am currently the Area Defense Counsel for

1  Kirtland Air Force Base.

2  Q.   So that means you're -- now, if I say this wrong, correct

3  me.  You're qualified and certified under Article 27 Bravo of

4  the UCMJ, and sworn under 42 Alpha as a Judge Advocate; is that

5  correct?

6  A.   That is correct.

7  Q.   And to get that certification, you went to an 11-week

8  training, correct?

9  A.   As well as -- it used to be that you got the certification

10  out of that 11-week training, but that is not the case any

11  longer.  When I went through, you had to get recommended by

12  your Staff Judge Advocate as well as a couple of military

13  judges.  So that happened for me when I was at Minot Air Force

14  Base.

15  Q.   Great.  And so currently, the closest analogy is you're

16  Senior Airman Justice's defense counsel; is that correct?

17  A.   Yes.  I represent him for military justice matters.

18  Q.   And as his defense counsel, you have a duty to zealously

19  advocate on his behalf?

20  A.   Yes, I do.

21  Q.   Both in and outside of the military courtroom?

22  A.   Theoretically, yes.

23  Q.   Okay.  And your tag line on your emails is, "Better call

24  Saulter," correct?

25  A.   Yes.

1  Q.  Is that a reference to an unscrupulous defense attorney in

2  a popular television TV show?

3  A.  It's a reference to a television show that's based in

4  Albuquerque.  As a criminal defense lawyer, I was placed by the

5  Air Force in Albuquerque, New Mexico, so yes, it's a play on

6  that terminology.

7  Q.  Okay.  And as you're zealously representing the client,

8  again, that zealous advocacy extends both in and outside the

9  military courtroom?

10  A.  I zealously represent my clients to the maximum extent

11  that I am allowed under both my Texas State Bar rules as well

12  as the Air Force Uniform Rules of Practice.

13  Q.  Okay.  And as you testified today, you are his detailed

14  defense counsel?

15  A.  I am his detailed defense counsel, as well as

16  Lt. Colonel Nicholas McCue, who is the Chief Circuit Defense

17  Counsel for the Western Circuit, Travis Air Force Base in

18  California.

19          MR. MOTE:  No further questions, Your Honor.

20          THE COURT:  Mr. Romero, anything else?

21                  REDIRECT EXAMINATION

22  BY MR. ROMERO:

23  Q.  Captain Saulter, in this case or any other case, have you

24  ever found to be unscrupulous?

25  A.  No.

1          MR. ROMERO:  Thank you.

2          THE COURT:  Thank you, Captain Saulter.  You may have

3   a seat back at the table.

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  Does the defense have any other

6   witnesses?

7          MR. ROMERO:  No, Your Honor.

8          THE COURT:  And what about the Government?

9          MR. STANFORD:  Your Honor, I've got to re-call

10  Sorenson.  I'm sorry, Your Honor.  There's some things that

11  were touched on that need to be clarified.

12         THE COURT:  All right.  Please ask him to come

13  forward.

14         MR. STANFORD:  The United States calls Special Agent

15  Nathaniel Sorenson.

16         THE COURT:  Please raise your right hand and be sworn

17  as a witness.

18         (NATHANIEL SORENSON, GOVERNMENT WITNESS, SWORN)

19                    DIRECT EXAMINATION

20  BY MR. STANFORD:

21  Q.   Will you tell me about your job at the Air Force for the

22  Court's edification?

23  A.   Yes, sir.  I'm a Special Agent with the Office of Special

24  Investigations, Kirtland Air Force Base, New Mexico.

25  Q.   And what disciplines does the Office of Special

1  Investigations oversee as a part of their investigations?

2  A.   We conduct felony level criminal investigations as well as

3  counterintelligence and force protection operations.

4  Q.   A moment ago, it was raised in testimony that Airman

5  Justice did not receive any unusual training in his capacity, I

6  think they called it the Wing on Kirtland Air Force Base.  Do

7  you recall that?

8  A.   I believe I know what you're speaking of, sir, yes.

9  Q.   Are you aware of some specialized training that Airman

10  Justice has received as a member of the Security Forces

11  squadron?

12  A.   Yes.

13  Q.   Can you describe that training for the Court?

14  A.   So, Security Forces members start their military life, if

15  you will, the same as most members -- most enlisted members,

16  that is, and go into basic military training.  During basic

17  military training is where every military member is trained on

18  the use of the M16, at the time I went through.  Maybe it is

19  the M4 now.  But it is a rifle platform.

20     Upon graduation of basic military training, they go to a

21  technical school, and in Airman Justice's case, that would have

22  been a Security Forces technical school.  So only Security

23  Forces members go to that, not every Air Force member.  And

24  throughout that tech school, they fire every weapon which he

25  did describe; the 249 belt fed machine gun, the 240 belt fed

1   machine gun, the M16, the M4, the M9 handgun.  And that is

2   specific to their training.

3       As well, when they get to their first duty station, they

4   do ongoing yearly qualifications on those firearms.  Maybe not

5   all of them, but a specified amount of them.  At least the M4

6   rifle and the M9 pistol.  And other members get qualified on

7   the more special weapons systems, such as the belt fed machine

8   guns.  So not every member does that.

9       And as well, I don't recall if it's on a quarterly basis

10  or a biannual basis, but Security Forces members specifically

11  go through what's called a force-on-force training.  What that

12  is, is a simunition training where they use training and ammo

13  that usually commonly shoots some sort of a paintball or some

14  less than lethal way to train where they actually engage

15  oppositional forces for a training environment.  And that is

16  specific to Special Forces members, Security Forces members, as

17  well as OSI agents, and not every Air Force member receives

18  that type of training.

19  Q.   That's highly specialized training?

20  A.   It is specialized.

21  Q.   Is it within the scope of his duties to research active

22  shooters?

23  A.   It is not.

24  Q.   Is it within the scope of his duties to research how to

25  make improvised explosive devices?

A.    It is not.

Q.    Does he, in fact, receive Air Force training on how to recognize and handle improvised explosive devices and other bombs?

A.    Yes, sir.  On a biennial basis, so every other year, airmen go to a training where they're trained on identifying what's called a UXO, which is an unidentified explosive device or something of that nature, as well as they're usually shown a slide-show, from my recollection the last time I did it, and it shows different types of IEDs which have been found in overseas environments, to show airmen the types of signs they need to be looking for.

        And as well, on a biennial basis, just before going to this training, airmen are required to take a cyber-based training which covers a lot of the same matter, and at the end of that training there's also a test to ensure that they retained that knowledge.

Q.    So it may be presumed that he's familiar with improvised explosive devices?

A.    I would say so, yes, sir.

Q.    There was also a mention that he had -- I confused myself. He said he had screen shots that he downloaded to his phone, and he said he had materials that he may or may not have downloaded to his phone.  Did you look at the materials on his phone?

A.    I did, sir.

Q.    And can you tell the Court, were those things that could
have accidently been saved to his phone?

A.    Sir, to my experience, and I am not a digital forensics
expert, but in my experience using a cell phone --

          MR. ROMERO:  Objection, Your Honor.

          THE COURT:  You're saying he's not an expert?

          MR. ROMERO:  Correct, Your Honor.

          MR. STANFORD:  He's not testifying as an expert, Your
Honor.

          THE COURT:  Let him go ahead and say what he
personally knows.

          MR. STANFORD:  Thank you.

A.    My personal knowledge of using a cell phone, I've never
once had a photograph accidently or some other way saved to my
phone.  It's always been a choice by myself.

Q.    Do you own a cell phone?

A.    I do.

Q.    Have you taken a screen shot?

A.    I have.

Q.    Does it require some intentional input by you to take a
screen shot?

A.    It takes an affirmative action.

Q.    Thank you.  Did you personally review what has been called
the bug out list found on his phone?

A.   I did.

Q.   What was it called on his phone?

A.   The title of it was The SHTF Checklist.

Q.   Have you encountered those initials regarding a similar list in your training and experience?

A.   Not to my recollection.

Q.   Okay.  Do you know what those initials stand for?

A.   I'm guessing Stuff Hit The Fan, or some other profanic version.

Q.   It's okay to say it.  Shit Hits The Fan.

A.   Yes, sir.

Q.   Have you heard that term before?

A.   I have.

Q.   Where have you heard that term before?

A.   Through conversations, sir.  I can't recall a specific time that I've actually heard that.

Q.   Okay.  Did you find the list to be consistent with what you might expect to find an airman to have?  Do most airmen have bug out or Shit Hits The Fan lists like that?

          MR. ROMERO:  Objection, Your Honor.  Leading.

          MR. STANFORD:  I'll ask it again.

          THE COURT:  All right, try it again.

BY MR. STANFORD:

Q.   In your experience, do most airmen have that kind of a list that they carry around with them?

A.    I've reviewed multiple cell phones of airmen, and I've
never found a list of that sort.

Q.    Are airmen that live on base required to abide by firearm
storage regulations?

A.    They are.

Q.    Is one of those regulations that they have to sign an
acknowledgment that if you live on base, you must register
firearms?

A.    More or less, sir, yes.  There's an installation policy
that if you are going to live in the on-base residences, there
is a form that you need to fill out putting the make, model and
serial number of the firearms that you intend to store within
that home, and also gain the approval of your chain of command
to do so.  And then that form needs to get filed with the
Security Forces Armory.

Q.    And was Airman Justice made aware of that requirement?

A.    He was.

Q.    Is it particularly difficult to gain permission to store
firearms in your base residence?

A.    It's not, sir.  It's a very simple process.  Like I said,
it's just a general form you fill out.  You put the make, model
and serial number, you take it to your chain of command and
gain their approval, and then generally you don't even have to
take it down in person, you can just email the form.  Sometimes
the Armory wants to verify the serial numbers, but it kind of

1  depends on who is running that program at that time.

2  Q.    So it sounds like they're pretty much approved out of

3  hand.

4  A.    More or less, sir.  Generally military members are

5  trustworthy enough to keep firearms in their home.

6  Q.    How many firearms were found in Airman Justice's home?

7  A.    Approximately 17, sir.

8  Q.    Were any of them registered?

9  A.    No, sir.

10 Q.    There has been testimony about the military hearing that

11 resulted in Airman Justice being released.  Are you aware of

12 that hearing?

13 A.    I am.

14 Q.    Were you, in fact, present for it?

15 A.    I was.

16 Q.    And you were the one who found the materials on his phone,

17 correct?

18 A.    I was, sir.

19 Q.    On the day of the hearing, when the witness testified on

20 his behalf, had the materials on his phone been discovered yet?

21 A.    They had not, sir.

22 Q.    So was anyone who testified at the hearing aware of the

23 materials on his phone?

24 A.    I assume that would have only been Senior Airman Justice,

25 sir.

Q.   And was the hearing officer made aware of the materials on

his phone when he approved Airman Justice's release?

A.   I do not believe he was.

Q.   So the conditions of release would then have been set

without the benefit of that knowledge, correct?

A.   That's correct.

Q.   Do you happen to know the date of his mental health

evaluation?

A.   I do not recall the specific date, sir.

          MR. STANFORD:  That's all I have, Your Honor.

          THE COURT:  Mr. Romero.

          MR. ROMERO:  May I have a moment, Your Honor?

          THE COURT:  Yes.

                    CROSS-EXAMINATION

BY MR. ROMERO:

Q.   Agent Sorenson, with regard to the alleged failure of

Mr. Justice to register his weapons with the installation, he

has not been found guilty of that offense; isn't that correct?

A.   Not as of yet.

Q.   And you indicated, I believe, that this was a downloadable

installation defense -- what did you call it?

A.   Sir, I don't recall stating that it was downloadable.

Maybe I did.  But it was a form that is given to the members

when they seek being able to store these weapons.  And I think

every squadron or unit is probably different in whether a First

1  Sergeant or some supervisor has it on hand, or whether they

2  contact the Armory to receive it.

3  Q.   Agent Sorenson, you have no evidence that Mr. Justice was

4  ever provided the form, that he ever acknowledged the existence

5  of the policy, and in fact, it's a For Official Use Only

6  policy, which would not be something that he would be able to

7  download at all; isn't that correct?

8  A.   I would have to answer your question in a couple of

9  different parts, sir.  Can you, if possible -- you asked me a

10 few different questions.  Would it be possible to ask those one

11 at a time?

12 Q.   Well, you have no proof through a sign-in sheet of him

13 receiving a briefing with regard to this policy, do you?

14 A.   I do not have a sign-in sheet wherein he acknowledged

15 this.

16 Q.   That's common when you're being briefed on policies that

17 are subject to UCMJ prosecution or administrative disciplinary

18 action, that you have to have an acknowledgment from the airman

19 or soldier in order to prove notice, in order to then prosecute

20 that soldier or airman; isn't that correct?

21 A.   Well, sir, when he agreed to live on Kirtland Air Force

22 Base, he signed a lease agreement, as is common when you're

23 going to take a rental property.  In that lease agreement, it

24 is specified that if you are going to be storing firearms in

25 your on-base residence, you need to register them with the

1  Armory, or something to that nature, to which he initialed next

2  to it at the time of his moving in.  So I would say we do have

3  proof of that, sir.

4  Q.   Of the registration requirement?

5  A.   Absolutely, sir.

6  Q.   He has not been convicted of that offense?

7  A.   Not as of yet.

8  Q.   Okay.  And do you have that lease with you?

9  A.   I do not.

10  Q.   How long have you been an agent?

11  A.   Since November of 2018.

12  Q.   So how many actual phones have you exacted as part of your

13  time as an agent with OSI?

14  A.   To my recollection, sir, what I can recall right now, it

15  would be seven.

16  Q.   And you indicated with regard to Mr. Justice's specialized

17  firearms training that he received firearms training that is

18  beyond what your basic trainee receives and it is equivalent

19  with what Special Forces or OSI forces receive.  Is that a fair

20  characterization?

21  A.   It is not, sir.  No, I did not say it was equal or

22  equivalent, I just stated that the type of training that I

23  specified during the answering of that question is limited to

24  those three or four career fields that I mentioned.  But I did

25  not say they are equal.

1  Q.    Well, in any event, the OSI career field is one of the

2  largest career fields in the Air Force, is it not?

3  A.    It's actually one of the smallest, sir.  That's definitely

4  not the truth.

5  Q.    How many thousands of OSI personnel, or technically

6  trained personnel are there in the Air Force?

7  A.    Last count I recall, sir, was just under 2500.

8  Q.    And does that include Mr. Justice's career field, it falls

9  under the OSI umbrella?

10 A.    No, sir, it does not.

11 Q.    How many are those, approximately?

12 A.    I would guess in the tens of thousands, but I don't know

13 for sure.

14 Q.    Okay.  So he is one of tens of thousands of similarly

15 trained airmen?

16 A.    That's accurate.

17 Q.    Okay.  Now, you testified at the pretrial confinement

18 hearing; is that correct?

19 A.    Yes, sir.

20 Q.    Okay.  And did you testify, or did you include in the

21 affidavit in support of the search warrant that the Wish.com

22 website was a dark website?

23 A.    No, sir, that was not listed in our affidavit.  We did not

24 say that Wish.com was a dark website in that affidavit.

25 Q.    Well, where did you --

A.   I also assume we're speaking of the military pretrial

confinement hearing?

Q.   Yes.

A.   Because this is the third one I've testified in.  So, just

clarifying.

Q.   Did you or anybody representing OSI in the course of your

investigation of Mr. Justice refer to Wish.com as a dark

website in support of the investigation or charges brought

against Mr. Justice?

A.   Nowhere in the affidavit did we state that Wish.com,

itself, is a dark website.

Q.   What did you state?  You used the term dark website?

A.   I'm not sure what your question is.  Is the term dark web

in the affidavit?

Q.   Yes.

A.   I believe it's mentioned.

Q.   Okay.

A.   But at no point was it the basis of our search.  It was

just stating that when people commonly order illegal silencers

from overseas, dark web is one of the avenues that they may

commonly use.  So it was referenced as that, as a reference.

But it was not the basis for our search, and it was not what we

based our probable cause off of.

Q.   It did not apply in this case, correct?  There was no dark

website involved?

1  A.   We did not find any evidence that Charles Justice was

2  ordering things --

3  Q.   Nor was there any cryptocurrency?

4  A.   Yeah, also on that, cryptocurrency is referenced with the

5  dark web in the affidavit, but at no point was it the basis of

6  our search or the basis of our probable cause.  It was

7  referenced through our collaboration with HSI and AFT and what

8  they have experienced in their law enforcement training.  At no

9  point was that the basis of our search, but I do believe it was

10  mentioned at some point in the affidavit, as some sort of a

11  reference.

12  Q.   You just threw it in there?

13  A.   I didn't throw it in there.  I didn't even draft the

14  affidavit.

15        MR. STANFORD:  Your Honor, the runner is well outside

16  of the baseline here.  Those terms are exciting terms, dark web

17  and cryptocurrency.  They in no way relate to the United

18  States' prosecution, and they do not bear on his dangerousness

19  or flight risk.  It's just nothing to do with this, Your Honor.

20        MR. ROMERO:  I'll move on, Your Honor.

21        THE COURT:  Let me ask first, Mr. Stanford, what is

22  your strongest case with respect to dangerousness?

23        MR. STANFORD:  Are you asking me to make my closing?

24        THE COURT:  Yes, I'd like to hear it now before we

25  continue, unless I'm going to hear some testimony about it.

1  You don't have to go into any detail, just one, two, three,

2  four, what are your strongest points.

3        MR. STANFORD:  That's not how I've organized my

4  presentation, Your Honor.  Really, this has all been covered

5  below where the Magistrate found that he was dangerous and a

6  flight risk, and the United States Probation Office has twice

7  found the same thing.

8        THE COURT:  We're about to hear from Sandra Day, the

9  Probation Officer, after the testimony is completed, but I just

10 want a general picture of what you think makes Mr. Justice a

11 danger to the community.

12       MR. STANFORD:  Well, this is -- so I am, or I am not

13 making my closing now?

14       THE COURT:  Just give me the major points.  You don't

15 have to elaborate.

16       MR. STANFORD:  This is a guy with combat and tactics

17 and weapons training, trained by the military, funded by the

18 taxpayers, who took it upon himself to amass quite a cache of

19 weapons and ammunition, 17 firearms and 7000 rounds of

20 ammunition, along with body armor, along with gas masks, along

21 with military headsets that have been identified as stolen,

22 that he was selling on eBay.  So there's that.  By itself,

23 that's a crime for the military courts, probably.

24       But he also ordered silencers, which he knows to be

25 illegal.  He knows they're silencers because of his specialized

1    training.  He doesn't think a silencer is anything other than a

2    silencer, just like you and I look at a gavel and based on our

3    training and experience, we know it's a gavel.  You can call it

4    a hammer, but we know it's a gavel.  By the same token, he

5    knows what a silencer is.  So he did that, a knowing violation

6    of military and United States law.  Again, it looks like a

7    different prosecution if that's all we have.

8            But what else we discovered was blatant glorification

9    of mass shooters.  Page after page of instructions on how

10   to construct an improvised explosive device.  Not as

11   Mr. Justice suggests borderline racism, but blatant racism.

12   Anti-government, alt-right, you know, white supremacist style

13   propaganda.  Those are free under the Constitution and he gets

14   to look at those things, but when you put those things in the

15   phone of somebody who has amassed a ton of weapons and ammo and

16   body armor and gas masks, who has specialized training in how

17   to use those, who has a Shit Hits The Fan list that describes

18   ways that he and his wife and his son can escape with body

19   armor, with munitions and with ammo, on the same phone where he

20   has his Last Will and Testament, well, we have quite a

21   different picture of somebody who was perhaps planning

22   something very dangerous.

23           You know, we see these things happen on TV, and it

24   seemed like it was weekly for a while, it's abated a little

25   bit, but we see these shooting events, and each of these

1  communities would give everything they had to have some advance

2  notice that something dangerous might be about to happen.

3  Well, we have that advance notice.  We don't know exactly what

4  his plan was, but we know that he's a man with the means and

5  the materials and the training to conduct something pretty

6  scary, and based on the shooter's manifesto and the other

7  glorifications of mass shooters and alt-right propaganda -- and

8  quite frankly, Your Honor, the United States calls B-S on his

9  assertion that he was just researching things in his

10  professional capacity.  Special Agent Sorenson testified he's

11  got no business doing such research.

12        This guy was planning something.  We don't know what,

13  but we have advance notice in this case, and that's why the

14  United States firmly believes that this person presents a

15  danger to the community.  He has the technical training -- he's

16  been trained in combat, in evasion techniques, in enemy evasion

17  techniques.  A halfway house?  Please.  Confined to quarters?

18  Please.  It's all just too uncertain.  And the community's

19  safety deserves better.

20        THE COURT:  Let me explain my function, as I see it

21  at this point.  I'm not the trier of fact.  A jury is going to

22  make a decision about the guilt or innocence of the federal

23  charges that were brought against the Defendant.  I'm required

24  at this stage of the proceeding, early on, to decide whether

25  there is any combination of factors that I could order that

1  would make sure that the Defendant, if he's released, would not

2  be a danger.

3       I gather he does no longer possess any of the weapons

4  or uniforms, or other things that you described.  Is that

5  correct?

6       MR. STANFORD:  We've seized them, but we also believe

7  him to be a very resourceful man who undoubtedly -- I mean,

8  morons on the street get AR-15s, Your Honor.  This is a trained

9  weapons specialist.  He knows how to get a weapon if he wants

10  one.

11       THE COURT:  Well, if he's under the supervision of a

12  responsible person that sees him daily, are there not means of

13  fashioning --

14       MR. STANFORD:  Definitely not.  He's somebody who has

15  specialized training to escape those kinds of conditions, and

16  he is somebody that has shown a disregard for authority.  The

17  reason I put that letter in there, the Letter of Counseling, is

18  because if you read through it, he's hitting a lot of the DSM

19  factors for a narcissistic personality, somebody who resents

20  authority.

21       You know, he stole the stuff from Cabelas, which he

22  dismisses as a foolish prank, but I think it's pretty serious

23  when you're an airman living in this community and you steal

24  from a gun store when you've got a gun store on base.  He's got

25  everything he needs on base, and yet he fails to report his

1 weapons, which the witness has testified would be painfully

2 easy for him to get approved. He amasses 7000 rounds of

3 ammunition. I have 1000 rounds in my garage; 7000 is

4 significant. Plus body armor and gas masks. We don't know

5 what his plan was, that's the problem.

6 THE COURT: I understand your concerns, but is there

7 not some way that I could find a custodian who would see him on

8 a regular basis and be aware if he started deviating from

9 conditions of release by, for example, trying to buy a weapon

10 or buy ammunition?

11 MR. STANFORD: Given his specialized training, Your

12 Honor, and the propensity he's already shown to thumb his nose

13 at authority and regulations, I don't believe that anybody

14 could do that, except maybe a squad of Delta Force soldiers who

15 will surround him at all times. I don't believe such a

16 condition exists. I don't think we, as a community, can rest

17 safely knowing what we know about him and then giving a person

18 or persons who don't have the same motivation, who don't have

19 the same commitment to the United States Department of Justice

20 or this Court to keeping the community safe -- they simply

21 aren't going to have the same motivation that this Court would

22 or that my office would or that the United States Marshals

23 would.

24 THE COURT: Thank you for that explanation.

25 Now, Mr. Romero, go ahead and complete your

1  examination.

2         MR. ROMERO:  I'll finish real quick, Your Honor.

3                CONTINUED CROSS-EXAMINATION

4  BY MR. ROMERO:

5  BY MR. ROMERO:

6  Q.   Did you acknowledge at the pretrial confinement hearing

7  that you had moved some of the children's toys in the house

8  next to the firearms that were located?

9  A.   No, sir.  I actually specifically testified to not doing

10  that.  That was a mischaracterization by Captain Saulter.

11  Q.   And again, there's been a reference to the Defendant

12  stealing Government property.  That's also not been resolved,

13  has it?

14  A.   That case is still pending, sir, yes.

15  Q.   So it has not been resolved?

16  A.   I don't believe so.

17  Q.   He has not been found guilty, as we sit here today?

18  A.   Guilty of?

19  Q.   Of any of your charges that are pending against him in the

20  military proceeding.

21  A.   Not as of yet.

22  Q.   Okay.  Thank you, sir.

23         THE COURT:  Any other questions?

24         MR. ROMERO:  No, Your Honor.

25         MR. STANFORD:  Not from the Government, Your Honor.

1            THE COURT:  All right.  Thank you, sir.  You may have

2 a seat out in the audience.

3            Any other witnesses by the Government?

4            MR. STANFORD:  No other witnesses.  I wanted to add

5 one last thing regarding conditions of release.

6            THE COURT:  Go ahead.

7            MR. STANFORD:  To put him in their care, given the

8 dangerousness he presents, it imposes quite a burden on the

9 military, which has a pretty serious job to do already, and I

10 think it's going to cause a lapse in their attention to the

11 duty they already have or a lapse in their attention to the

12 duty of caring for him, either of which is an untenable

13 prospect for the military and for us, as citizens of the

14 community.  I simply don't think we can ask them to do that.  I

15 think he's too dangerous, and they have other really important

16 things they're working on.

17            THE COURT:  Okay, let me explain to counsel what I

18 plan to do next.  I want to hear from the United States

19 Probation Officer, Sandra Day, who's been listening to all of

20 this.  She's made two recommendations against release based on

21 concerns about dangerousness to the community.

22            So let me turn to Ms. Day, who is on the screen.  You

23 can see her.  And let me get your views about this.  Has

24 anything that's occurred today changed your recommendation?

25            MS. DAY:  Your Honor, I have been staffing with my

1  co-worker, who was also in the United States Air Force, and he

2  is saying that training -- he's saying training as an ISO is a

3  pretty typical thing for most, because he did security, also.

4  But it sounds to me like this individual might have further

5  training, which is a big concern.  And due to the nature of the

6  offense, if he's found guilty, or -- well, at this point he's

7  still presumed innocent, Your Honor.  But the nature of the

8  offense is a concern for us.

9       However, if you're inclined to release, I can't say

10  that placing him at La Posada Halfway House with a GPS would

11  absolutely prevent any type of violence, because he can cut off

12  the bracelet and flee.  However, if he -- it seems to me that

13  just due to the nature of the offense, Your Honor, and the

14  documents presented, he does present a danger to the community

15  and it is a concern for Pretrial Services.

16       If you were to release and let him go back to the

17  base, we could still supervise him there, as well.  It just

18  wouldn't be as close.  So he could have possibly two agencies

19  supervising him.  But I still -- if he was still able to have

20  access to firearms in any way, that would be a concern.

21       So Your Honor, I just think that at this time -- I

22  apologize for pausing, because he is presumed innocent at this

23  time.  I would just recommend continued detention, Your Honor,

24  at this time.

25       THE COURT:  You mentioned a halfway house.  Is that

1 available at this time?

2      MS. DAY:  Yes, it is, Your Honor.  And he has been

3 in, basically, quarantine for 20 days at the jail, so he would

4 be eligible for release, probably today.

5      THE COURT:  If he were to be released to La Posada,

6 in the past I've experienced situations where release to

7 La Posada was combined with conditions that he is restricted to

8 the premises instead of being able to leave to work during the

9 day or to visit his lawyers, and so on, that it would be

10 full-time at La Posada and monitored by an ankle bracelet.  Is

11 that a possibility in this case?

12      MS. DAY:  Yes, Your Honor.  We do have both GPS and

13 the radio-frequency units available at this time, and there is

14 bed space available at La Posada.  And the component, or we

15 would recommend -- home incarceration, he wouldn't be able to

16 go anywhere.  But home detention, he would be able to go visit

17 with his attorney and attend counseling, if need be.

18      THE COURT:  Well, under home incarceration, his

19 lawyer could visit him at La Posada, could he not?

20      MS. DAY:  Yes, Your Honor.

21      THE COURT:  Okay.  Any other observations or comments

22 you want to make?

23      MS. DAY:  No, Your Honor.

24      THE COURT:  Okay.  Let me turn to Mr. Romero and have

25 you make a proposal of release under conditions.

1    MR. ROMERO:  Your Honor, obviously without going into

2 my closing argument, I would just inform the Court that, of

3 course, any condition less than full detention for Mr. Justice

4 is appropriate given that presumption of innocence and given

5 that he has actually proven himself to be compliant with the

6 prior conditions of release that were set in an identical case,

7 essentially.  And Your Honor, La Posada would be obviously

8 something that we would not be opposed to, as compared to the

9 conditions of confinement that he's facing at this time.

10    His prior conditions of detention under his pending

11 UCMJ case would also be something that we would not object to,

12 because I have confidence in this young man that he will be

13 compliant because he has a record of being compliant.  The

14 access to these firearms and the access to this literature goes

15 back to 2015.

16    THE COURT:  Well, let me ask this, and Captain

17 Saulter may be the person to respond to it.  If I were to order

18 conditions of release that confined Mr. Justice to La Posada

19 Halfway House with GPS or other monitoring, and a condition

20 that he is restricted to La Posada, cannot go elsewhere, cannot

21 go visit his lawyer, his lawyer can come see him, but if I were

22 to order such, what happens to his current conditions regarding

23 the military charges?

24    CAPTAIN SAULTER:  I would say that's an interesting

25 question, Your Honor.  Essentially, right now the only reason

1  he's still in the military is because he's in confinement,

2  which is what has extended his term of service, because they

3  call what he's currently in lost time.  That's what the

4  Government advocated for at the preliminary hearing.  I'm not

5  sure how the halfway house would weigh into that.  He might

6  still be coded civilian confinement, but he might be coded

7  present for duty, depending on what you described, if he could

8  still go to work every day.  Plenty of military members live

9  off the base.  So that's, honestly, a personnel question.

10             THE COURT:  Okay.

11             CAPTAIN SAULTER:  Thank you, Your Honor.

12             THE COURT:  Thank you, Captain Saulter.

13             Well, let me ask counsel for the Government to

14  respond to a proposal that he be released to La Posada Halfway

15  House and restricted to there under GPS monitoring.

16             MR. STANFORD:  Your Honor, we just heard the United

17  States Probation Office say how easy it would be for him to

18  escape there.  He can cut it off.  People escape from La Posada

19  all the time.  Imbeciles, imbeciles without any training escape

20  from La Posada.  We have somebody who is bright and capable and

21  resourceful.

22             Your Honor, La Posada, or any kind of confinement

23  like that, presents just an untenable situation.  This is

24  somebody who has been trained to escape from situations like

25  that, trained to escape.

1    THE COURT:  What is your concern?  That if he were at

2  La Posada under GPS monitoring with an ankle bracelet, that he

3  would cut the ankle bracelet off, somehow acquire an arsenal of

4  weapons --

5    MR. STANFORD:  It doesn't have to be an arsenal.

6    THE COURT:  Well, acquire a single --

7    MR. STANFORD:  Again, Your Honor, I'm confused.  I'm

8  sorry.  We have a trained military specialist, and again,

9  imbeciles get guns on the street every day.  He can find one

10  ten times easier than someone without his training, and he

11  knows how to use it.

12    I'm not saying that he's going to escape La Posada

13  and begin, once again, amassing a stockpile of weapons and

14  ammo, but he might.  I think he's shown some anti-authoritarian

15  tendencies, he's shown that he was planning something pretty

16  scary, and he's got the training to do it.

17    And then we've got a United States Magistrate Judge

18  that found he was a danger, we have the United States Probation

19  Officer issuing two reports, and then today stating that the

20  Probation Office believes he's a danger and should not be

21  released to third-party custody, and we've got quite a bit of

22  evidence that he was engaging in at least the preplanning

23  stages of something pretty scary.  So I'm sort of at a loss for

24  how to answer any further questions about it.

25    To the United States, the writing is on the wall.

1    You've got -- I wrote them down while we were sitting here.

2    You've got all these cities, Your Honor.  Christchurch,

3    El Paso, Las Vegas.  All these cities, you know.  In the United

4    States' estimation, we have narrowly avoided adding Albuquerque

5    to that list.

6            So I think the idea of him cutting his ankle bracelet

7    loose at La Posada, or sneaking out from Kirtland Air Force

8    Base in the middle of the night and simply fleeing, I think

9    that's the minimum that we're facing.  I absolutely believe

10   that a guy who made a bug out list, a guy who planned for

11   whatever he was planning, already today sitting in court knows

12   how he plans to escape from whatever soft third-party custody

13   we put him in.  The hardest one we could impose upon him still

14   isn't enough to assure that a person with his training will

15   stay where we want him to.

16           THE COURT:  Let me ask if you know the answer to the

17   question that I posed to Captain Saulter, about what would

18   happen if I were to order his release to La Posada Halfway

19   House under strict conditions.  How would that impact the

20   military justice proceedings?

21           MR. STANFORD:  I honestly don't know.  I have been

22   approving every request for him to travel to their hearings

23   with the United States Marshals accompanying him.  There have

24   been, by my last count, five such appearances where my office,

25   in cooperation with the Air Force, has made him available for

1   every single hearing.  You know, without even asking 20

2   questions, we're making him available as needed.  I don't know

3   that it would be as easy with La Posada.  It might be even

4   easier.  But, you know, the inconvenience of doing it the way

5   we've been doing it, keeping him in jail with the Marshals

6   guarding him, that's been working just fine.  I've been

7   agreeing to everything.

8        So I don't think any modification is needed to serve

9   his Air Force prosecution, which, Your Honor, we have

10  jurisdiction over.  We're cooperating, but I think the offenses

11  he faces here are far more serious than what he faces over

12  there.  So my preference is that our case be given kind of

13  first priority with all these questions.

14       THE COURT:  Well, my question is, do I have the legal

15  authority to do that.

16       MR. STANFORD:  I don't know.

17       MR. ROMERO:  Your Honor, may I respond?

18       THE COURT:  If you know the answer, sure.

19       MR. ROMERO:  Your Honor, similar to what has occurred

20  at the Cibola County Detention Center, whenever the military

21  authorities have requested his presence there by a writ of

22  habeas corpus or some similar document with the concurrence of

23  the Government, he's been allowed to be transported or has been

24  transported to appear for those proceedings.

25       Yes, Your Honor, in your order setting conditions of

1  release, that would be another condition.  In other words, your

2  condition would expressly indicate that he is to make himself

3  available for all scheduled military court proceedings, and

4  Captain Saulter or I would take him to those proceedings, as

5  had occurred previously when he was on conditions of release

6  and in full compliance.

7      THE COURT:  Okay.  Well, I'm still at a little bit of

8  a loss as to what my authority is in terms of ordering a

9  release to La Posada, for example, in terms of whether that

10  conflicts with the authority of the Air Force.

11      MR. ROMERO:  Your Honor, as the Court recalls, and

12  Captain Saulter can confirm, at the February 26th pretrial

13  confinement hearing, he was released, essentially, on

14  conditions, and my understanding of the conditions was he had

15  an initial hard 72-hour hold where he was not allowed to leave

16  the base, which he complied with, he was required to go -- or

17  recommended, which he did, to submit to a mental health eval,

18  which he did, and then because he's still an active duty

19  service member, he was given an alternate duty station or work

20  assignment to report to.

21      But other than that, and Captain Saulter can correct

22  me if I'm mistaken, other than that, he was free to go on and

23  off the base as he pleased, and that state of affairs existed

24  for approximately 17 or 18 days before he was arrested in this

25  case, Your Honor.

1          THE COURT:  Mr. Stanford.

2          MR. STANFORD:  None of the materials found on his

3    phone, the plans and all that, were known to the people who

4    made those decisions.  So he was released on conditions and he

5    was evaluated by the mental health evaluator before they knew

6    anything about what was on his phone.  So it's sort of

7    irrelevant that they let him out on conditions and he did well,

8    because he thought he got away with it.  He didn't realize they

9    were going to get all the materials from his phone.

10          And when the judge -- it's not a judge, it's a

11   hearing officer.  When the hearing officer ordered him

12   released, he had no idea what was on his phone.  I'm quite sure

13   they would sing a different tune if they were to revisit that

14   hearing today.

15          MR. ROMERO:  Your Honor, may Captain Saulter address

16   that point with regard to the subsequently discovered phone

17   material?

18          THE COURT:  Sure.

19          CAPTAIN SAULTER:  Your Honor, I apologize in advance.

20   Our system of doing things in the military is a little strange

21   sometimes, and our rules are somewhat analogous to the rules

22   here, but also somewhat completely different.

23          The military does have the capability to renew their

24   attempt at placing Airman Justice in pretrial confinement if

25   they discover new information.  So essentially, if the idea is

1  that that information wasn't available at the original hearing,

2  then they can go back to the same Pretrial Confinement Review

3  Officer, or a different one on Kirtland Air Force Base, present

4  new information and try again to have him placed in a military

5  pretrial confinement.  So understanding what is being said,

6  that that information, at least some of it wasn't presented at

7  the pretrial confinement hearing, that is contemplated by the

8  rules and able to be addressed subsequently.

9          THE COURT:  Well, what is the likelihood that that

10 will happen?

11         CAPTIAN SAULTER:  Given the commitment of the United

12 States Government to keep Airman Justice thus far detained, I

13 would say -- Government counsel for the case is also in the

14 courtroom.  But I would imagine they might try.  I don't know

15 that the Pretrial Confinement Review Officer is going to be

16 convinced by simply the materials put forth here today.

17         THE COURT:  Well, what would prompt that type of

18 review in the military justice system?

19         CAPTAIN SAULTER:  His commander would order him into

20 confinement again, if his commander believed that he had new

21 information to substantiate that confinement, and then the

22 Kirtland Air Force Base legal office would pursue another

23 hearing within seven days of the imposition of that

24 confinement, if they decided to go that route.  His commander

25 alternatively could order any pretrial restraints.  So we have

1  pretrial confinement, pretrial restraint.  He could order any

2  amount of pretrial restraint to include restriction to base, to

3  include alternate duty locations, to include conditions on

4  release.

5       After the mental health evaluation, his commander

6  found that none of those were necessary.  In the military,

7  we're required to use the least restrictive means, and his

8  commander found after the mental health evaluation that no

9  additional requirements were necessary to have him appear at

10 hearings and not cause any other serious misconduct.

11      THE COURT:  How would someone in the military justice

12 system initiate the requested review given the materials that

13 were found subsequent to his release in the military?

14      CAPTAIN SAULTER:  Yes, Your Honor.  What they would

15 have done, instead of going to the AFT and the DOJ, which had

16 already declined prosecution in the case previously, they could

17 have simply just taken the same information back to the

18 commander and told the commander what the information was to

19 see if that prompted the commander to order Airman Justice back

20 into confinement.

21      THE COURT:  Can that still be done?

22      CAPTAIN SAULTER:  Yes, it could.

23      THE COURT:  And who would initiate that?

24      CAPTAIN SAULTER:  That would be essentially the

25 commander, but usually through the function of the

1   investigators and the legal office.  So basically, they would

2   be the ones that would typically advise the commander on

3   whether that was a good idea, and then the same requirements

4   from the first hearing would then be in place.

5          So from the imposition of confinement, military

6   confinement, there would have to be a 72-hour determination by

7   the commander that it's still necessary, and then a seven-day

8   hearing by the Pretrial Confinement Review Officer that this is

9   new information that justifies the confinement.

10         THE COURT:  Well, has the office considered this

11  information?

12         CAPTAIN SAULTER:  They've had access to it, Your

13  Honor.

14         THE COURT:  And do you know if they made a decision

15  one way or the other?

16         CAPTAIN SAULTER:  I think what they decided to do was

17  to seek the AFT and the Department of Justice to take

18  jurisdiction over one of the myriad of offenses so that they

19  could seek civil pretrial detention.  The standard in the

20  military is high once someone has been found, by a

21  preponderance of the evidence by a neutral officer, to be not a

22  risk of flight and not a risk for serious misconduct.  I have

23  never seen or heard of a successful attempt to present new

24  information and then, without new misconduct, having that

25  person, you know, put back into pretrial confinement.

1          So essentially, they're saying they found new

2  evidence, not new misconduct, so I would assume that the

3  likelihood of success at the pretrial confinement hearing would

4  be low.

5          THE COURT:  Okay.  Thank you, Captain Saulter.

6          Mr. Mote, let me ask, do you have questions you want

7  to ask Captain Saulter about this?

8          MR. MOTE:  Your Honor, I would just like to address

9  the Court on the information that was just provided.  May I

10 approach the podium, Your Honor?

11         THE COURT:  Yes, please do.

12         MR. MOTE:  I'd like to address the Court based on the

13 information that was just provided to the Court.  What you just

14 heard, Your Honor, from the defense attorney that represents

15 the Senior Airman in his UCMJ case is all mere speculation and

16 conjecture.  What happens when you release this Defendant to

17 military justice control is totally within the purview of the

18 military justice commander over there.  He could decide, I

19 don't want to do anything, I'm just going to let him go back to

20 work, and Your Honor, as we've already elicited from testimony

21 here today, the Defendant would have the ability to drive right

22 off the base and be out of here to Timbuktu before the sun goes

23 down, because there is nothing -- if this Court releases him to

24 military control, their authority is going to come from that

25 book that I had the witness look at earlier, which is the

1    Uniform Code of Military Justice, Your Honor.

2           So if this Court is inclined to release him to

3    military control, the Government's concern is that there is no

4    way that we are telling the military how to conduct their

5    business and how to initiate the UCMJ proceeding, Your Honor.

6           THE COURT:  Let me make it clear, I'm not inclined to

7    release him to control of the military.

8           MR. MOTE:  Okay, Your Honor.

9           THE COURT:  What I'm trying to figure out is whether

10   there's a combination of conditions that includes release to

11   La Posada Halfway House that would make sure that the Defendant

12   is not a danger to the community, and I'm kind of stuck on the

13   issue about my authority to make that decision independent of

14   whatever the military justice system wants to do.  For example,

15   if I released the Defendant to La Posada Halfway House under

16   conditions and there was another review by the military of the

17   information they didn't have previously, they may then take him

18   into custody.

19          MR. MOTE:  Your Honor, that's an interesting

20   question, but he is currently in our custody, so I think in

21   order to do so, they would have to seek a writ in order to

22   bring him back into their custody.

23          THE COURT:  Do you agree with that, Mr. Romero?

24          MR. ROMERO:  I do, Your Honor.  And I would just add

25   that both, oddly -- or not so oddly, the two agencies have been

1  copacetic and cooperating with each other.  In other words, it

2  was after he was released and after, according to Captain

3  Saulter, that ATF had taken a pass on the case that then it was

4  picked up by the AFT and U.S. Attorney's Office.  So there's

5  been coordination in that regard, Your Honor.

6        MR. MOTE:  I have nothing further, Your Honor.

7        THE COURT:  All right, thank you.  You may have a

8  seat.  And Ms. Day, is there anything about what you've heard

9  since you last spoke that changes your point of view?

10        MS. DAY:  No, Your Honor.

11        THE COURT:  Based primarily on the recommendations of

12  Probation, it'll be my finding that there are no conditions or

13  combination of conditions that will reasonably assure the

14  safety of the community if the Defendant were to be released

15  pretrial.  I think it is a difficult question, but I believe

16  there is sufficient evidence of potential danger to support the

17  recommendation of Probation.  So I'll deny the appeal of the

18  detention order.

19        I also took into account the very thorough review

20  done by Judge Khalsa at the hearing on, I think it was

21  April 16th -- I'm sorry, on March 19th.  My apologies.  So

22  given all of that, I will require that the Defendant be

23  detained finding a potential dangerousness to the community if

24  he were to be released.

25        Now, let me ask counsel about where you stand in this

1    case and when we could go to trial.

2           MR. STANFORD:  You know, strangely, Your Honor, after

3    all the lawyering that's been done on this case, the underlying

4    facts that would proven the charges are fairly simple.  The

5    Government can be ready fairly quickly.

6           THE COURT:  How many witnesses does the Government

7    have?

8           MR. STANFORD:  Half a dozen, maybe.  That may be a

9    generous estimation on my part.

10           THE COURT:  Well, let's walk through them, if you can

11    identify who they are as of today.

12           MR. STANFORD:  I don't recall everybody's name.

13    There certainly would be the AFT examiner who will certify that

14    these devices were, in fact, silencers prohibited under the

15    National Firearms Act and other statutes.  There will be --

16           THE COURT:  On that witness, how long would the

17    testimony take?

18           MR. STANFORD:  From the Government?  No more than an

19    hour-and-a-half.

20           THE COURT:  What about cross-examination?

21           MR. ROMERO:  Your Honor, I would say -- I haven't

22    given it a lot of thought, to be honest with Your Honor, but I

23    would say approximately the same period of time.

24           THE COURT:  All right.  Who is your next witness?

25           MR. STANFORD:  The case agent from AFT, Special Agent

1  Kempton, K-e-m-p-t-o-n.

2         THE COURT:  How long do you expect his direct

3  testimony to be?

4         MR. STANFORD:  A couple of hours.

5         THE COURT:  And for cross-examination?

6         MR. STANFORD:  This is Agent Kempton, Your Honor.  A

7  couple of hours.

8         THE COURT:  Okay.  For cross-examination?

9         MR. ROMERO:  Approximately the same time, Your Honor.

10         THE COURT:  Who's next?

11         MR. STANFORD:  Special Agent Nathaniel Sorenson,

12  probably three hours.

13         THE COURT:  And cross-examination?

14         MR. ROMERO:  Same, Your Honor.

15         THE COURT:  Is he the case agent?

16         MR. STANFORD:  He is the OSI.  We have co-case agents

17  here.  One from AFT and one from Air Force OSI.

18         THE COURT:  And who is your one from Air Force?

19         MR. STANFORD:  Sorenson.

20         THE COURT:  Okay.  Who's next?

21         MR. STANFORD:  There's going to be at least one or

22  two tech agents who downloaded the stuff from the phone.  As I

23  said, we're still sifting through some of the hard drives and

24  other electronic media of the investigation, and I suspect

25  there will be a couple of tech agents or specialists on that

1  front, and they may be, you know, two hours each.

2  THE COURT:  What all are they going to testify about?

3  MR. STANFORD:  What processes they used to extract

4  the information, what they found, their work experience, their

5  expertise, things like that.

6  THE COURT:  And for cross-examination of these two

7  tech agents?

8  MR. ROMERO:  Approximately half that time I would

9  imagine, Your Honor.

10  THE COURT:  All right.  Any other witnesses?

11  MR. STANFORD:  Your Honor, I'm guessing there are at

12  least one or two agents from OSI who assisted in serving the

13  search warrant at Airman Justice's residence.  I would guess

14  they're a couple of hours each.

15  THE COURT:  What's the substance of their testimony?

16  What they found at the residence?

17  MR. STANFORD:  Things that they found.  You know,

18  their participation in the search of the house.  Expanding

19  on -- you know, Agent Sorenson oversaw this, but he's one guy.

20  There were many people looking at the house, and they will

21  provide the complete picture of everything found at the house,

22  and where, and in what condition, that kind of thing.

23  THE COURT:  Okay.  How long do you think the search

24  agents will testify?

25  MR. STANFORD:  A couple hours for each one.  Maybe

1  less.

2          THE COURT:  And cross-examination?

3          MR. STANFORD:  You know, I tend to be fairly

4  succinct.  Some of these estimations may be a little high, but

5  I figure it's better to overestimate for now.

6          THE COURT:  And for cross-examination?

7          MR. ROMERO:  Half that time, Your Honor.

8          THE COURT:  Any other Government witnesses?

9          MR. STANFORD:  Not that I can think of right now.

10          THE COURT:  How about defense witnesses?

11          MR. ROMERO:  Your Honor, my client is likely to

12  testify, as well as either an investigator and/or a firearms

13  expert, and we may have a couple of character witnesses.  I

14  imagine maybe about six total witnesses at most.  And I would

15  think I would be able to put them all on, with cross, in a full

16  day of trial.

17          THE COURT:  Okay.  It's going to take the Government

18  at least three days to present its witnesses, so you're going

19  to have four days of testimony, and a day of selecting a jury,

20  opening statements and the like, and time for jury

21  deliberations.  It's going to take you a full week, at least.

22  Let's see what our calendar shows after July 6th.  What about

23  August?

24  (A discussion was held off the record.)

25          THE COURT:  All right, why don't we tentatively

1 schedule the trial to begin on Monday, August the 10th, at

2 9:00.  I'm sure we're going to need a pretrial conference

3 sometime in July.

4 (A discussion was held off the record.)

5          THE COURT:  I'll set the pretrial conference at 1:30

6 on July 20th.

7          MR. STANFORD:  Your Honor, we can take this up

8 another time if you wish, but I just conferred with my

9 co-counsel and we're both unavailable the week of

10 August 10th.  But if you wish, we can save that conversation

11 for the pretrial conference on July 20th.

12          THE COURT:  What weeks during August do you have

13 available for a week-long trial?

14          MR. STANFORD:  One moment, Your Honor.  Either of the

15 last two weeks of that month are both clear for my co-counsel

16 and I, Your Honor.

17 (A discussion was held off the record.)

18          THE COURT:  What about the week of August 30th, then?

19          MR. STANFORD:  We can make that work, Your Honor.

20          THE COURT:  And from the defense?

21          MR. ROMERO:  Yes, Your Honor.

22          THE COURT:  Okay, we'll plan to have the trial

23 beginning 9:00 on August 31st, and still have the pretrial

24 conference at 1:30 on July 20th.

25          Let me ask Mr. Stanford, anything else you want to

1  bring up on behalf of the Government?

2      MR. STANFORD:  Not at this time, Your Honor.

3      THE COURT:  And Mr. Romero, anything on behalf of the

4  Defendant?

5      MR. ROMERO:  No, Your Honor.

6      THE COURT:  I thank everyone for your appearances and

7  input today.  The Court is in recess at this time.

8  (Proceedings adjourned at 3:43 P.M.)

9                      *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW MEXICO

3   _____
                                  )
4   UNITED STATES OF AMERICA,     )
                                  )
5           Plaintiff,            )
                                  )
6       vs.                       )    No. 1:20-CR-01210-JAP
                                  )
7   CHARLES BRENT JUSTICE,        )
                                  )
8           Defendant.            )
    _____)

9

10          CERTIFICATE OF OFFICIAL COURT REPORTER

11      I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

12  Realtime official Court Reporter, in and for the United States

13  District Court for the District of New Mexico, do hereby

14  certify that pursuant to Section 753, Title 28, United States

15  Code, that the foregoing is a true and correct transcript of

16  the stenographically reported proceedings held in the

17  above-entitled matter on Tuesday, June 2, 2020, and that the

18  transcript page format is in conformance with the regulations

19  of the Judicial Conference of the United States.

20  Dated this 25th day of June, 2020.

21

22  _____
    MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23  UNITED STATES COURT REPORTER
    333 Lomas Boulevard, Northwest
24  Albuquerque, New Mexico  87102
    Phone:  (505)348-2334
25  Email:  Mary_Loughran@nmd.uscourts.gov