**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,                                       Cr. No. 20-1210 JAP

v.

CHARLES BRENT JUSTICE,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

On May 12, 2020, a federal grand jury charged Defendant Charles Justice in a three-count indictment with (1) knowingly and fraudulently importing and causing to be imported to the United States, one or more silencers, knowing that importing silencers is illegal, in violation of 18 U.S.C. § 545; (2) knowingly, and without authorization from the Attorney General in accordance with 18 U.S.C. § 925(d), importing and bringing into the United States a firearm, that is, a silencer, in violation of 18 U.S.C. §§ 922(1) and 924(a)(1)(C); and (3) knowingly possessing a firearm, that is, a silencer, not registered to him under the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.[1]  Defendant seeks to suppress all evidence on which those charges are based as the fruits of an unlawful search.[2]  The Court will deny Defendant's Motion.

---

[1] *See* INDICTMENT (Doc. 21).
[2] *See* DEFENDANT'S MOTION TO SUPPRESS SEARCH OF 760B SILVERBERRY CIRCLE, SE, KIRTLAND AIR FORCE BASE, N.M., 87116, AND DEFENDANT'S TRUCK ("Motion") (Doc. 29). The Motion is fully briefed. *See* UNITED STATES' RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS (Doc. 37); DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION TO SUPPRESS (Doc. 38).

I.   **BACKGROUND**[3]

A.  **The Underlying Investigation**

On February 7, 2020, Special Agent ("SA") Zachary Souder, a Homeland Security Investigations ("HSI") officer stationed in Albuquerque, NM, informed SA Caleb Meskill of the Air Force Office of Special Investigations ("AFOSI") detachment at Kirtland Air Force Base ("KAFB") that HSI was investigating an individual who lived on KAFB for attempting to illegally import a silencer ("Silencer" or "Subject Parcel"), contrary to the National Firearms Act ("NFA") and other federal law.  Mot., Ex. 1 at 7.  SA Souder identified Defendant as the addressee of the Subject Parcel, which Customs and Border Protection ("CBP") intercepted at the John F. Kennedy mail center in Jamaica, New York.  *Id*. at 8; *see also* Tr. 7:19–25.[4]  CBP agents determined that the Subject Parcel qualified as a "firearm silencer" under the Gun Control Act, 18 U.S.C. § 921(a)(24), and therefore notified HSI.  Mot., Ex. 1 at 8.  CBP then forwarded the Subject Parcel to Albuquerque at HSI's request for further investigation.  *Id*.

In response to this information, SA Meskill confirmed via the Air Force Global Address Book and the Department of Defense Person Search that Defendant was an active duty airman stationed at KAFB.  *Id*.  SA Meskill also contacted SA Nathan Kempton of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to request a Federal Licensing System check to determine whether Defendant had ever applied for or received the required ATF permit and tax stamp that allows an individual to import and or possess a silencer under the NFA.  *Id*.  SA Kempton confirmed that Defendant (1) never applied for nor received the requisite permit and tax stamp and

---

[3] The following section constitutes the Court's essential findings of fact under Federal Rule of Criminal Procedure 12(d). The Court notes that Defendant has not challenged the supporting probable cause affidavit's underlying statements of fact. Rather, Defendant only maintains that the facts do not establish probable cause.  Therefore, the Court adopts in full as its factual findings the probable cause affidavit's underlying statements of fact.
[4] This MEMORANDUM OPINION AND ORDER cites to the court reporter's real-time unedited and unofficial transcript.  All page and line citations are subject to change on the official, edited transcript.

(2) never applied for a Federal Firearms License. *Id.* Thus, Defendant was not authorized to import, manufacture, or sell a silencer, and he was not allowed to receive any NFA controlled items at his on-base residence. *Id.*

Also on February 7, 2020, SA William McCoy, who is part of the AFOSI detachment at KAFB, investigated whether Defendant had ever applied for or received permission to store firearms at his on-base residence, as required by Air Force Instruction ("AFI") 31-101. *Id.* The 377th Security Forces Squadron at KAFB confirmed that Defendant never applied for nor received permission to register and or store firearms at his on-base residence. *Id.*

On February 10, 2020, SA Meskill met with SA Souder, who further advised that HSI possessed records establishing that over a ten-month period Defendant placed approximately thirty orders to companies located in China through wish.com, a website associated with the dark web and known for trafficking illegal gun parts. *Id.* at 9; *see also* Tr. 8:2–16, 21:1–7, 38:13–22. Approximately fifteen of these orders were for suspected gun parts, including (1) a "trigger fish," which is a part designed to convert a semiautomatic Glock pistol into a fully automatic weapon, and (2) a butt stock receiver, which allows a Glock pistol to be shoulder fired like a short barreled rifle. Mot., Ex. 1 at 9.[5] SA Souder explained that both of these items are controlled under the NFA and require permits and tax stamps before they may be legally possessed in the United States. *Id.* SA Souder also revealed that HSI suspected that these orders contained illegal gun parts due to the identities of the shippers and the wording of the customs declarations, which HSI uncovered and verified through other investigations into NFA regulated items. *Id.*[6]

---

[5] HSI ultimately allowed delivery of these packages to Defendant's on-base residence because he was not under investigation until CBP intercepted the Subject Parcel. *Id.*

[6] SA Souder cautioned, however, that some of the items that Defendant purchased were likely legal. *Id.* SA Souder also warned that there were multiple explanations for why Defendant made so many purchases from China. *Id.*

3

On February 12, 2020, SA Souder transferred the Subject Parcel to SA Meskill.  *Id*.  SA Meskill noted that the shipper was listed as "Xiaohuji," with the contents labeled as "fuel filter."  *Id*. The contents included a front endcap with a marked center, a front endcap with an open center, a baffled core, an expansion chamber, and an outer tube, which according to the ATF, is a silencer configuration.  *Id*.

### B. The Search Authorization

On February 18, 2020, SAs McCoy and Nicholas Dorval, also of the AFOSI, as well as Major Bradley Sauer, an Air Force judge advocate, met with Colonel David Miller, base commander of KAFB, to discuss an authorization for search of Defendant's on-base residence and truck.[7]  Tr. 13:4–6, 43:17–19.  At the meeting, Colonel Miller became concerned with the mechanics of the requested search.  This apprehension stemmed from the supporting probable cause affidavit executed by SA Dorval, which suggested that a United States Postal Service ("USPS") inspector perform a controlled delivery of the Subject Parcel to Defendant's on-base residence before agents searched the premises.  *Id*. 44:3–16.  Specifically, agents advised Colonel Miller that the USPS inspector was not available to perform the controlled delivery.  *Id*. 9:20–10:16.  In light of this development, and after consulting with Major Sauer and the AFOSI agents, Colonel Miller eliminated the proposed controlled delivery for the safety and security of everybody on the installation.  *Id*. 44:18–22; 55:11–16.[8]

It was at this time that Colonel Miller authorized the search, concluding that probable cause existed even without the controlled delivery.  *Id*. 12:19–23, 13:4–10.  Colonel Miller memorialized

---

[7] Prior to the meeting, AFOSI and several federal agencies had been in contact with Colonel Miller about the ongoing investigation.  *See*, *e.g*., Tr. 9:20–10:7, 22:19–20, 38:10–39:15.

[8] Colonel Miller's concern was further informed by Defendant's record, which included theft of ammunition, as well as the proximity of Defendant's on-base residence to an elementary school.  Tr. 37:8–38:9.

this authorization via AF Form–1176, Authority to Search and Seize ("Warrant"). *Id*. The Warrant, which agents had drafted prior to its authorization by Colonel Miller, included an attached evidence listing and incorporated the Dorval Affidavit to document the underlying investigation that ultimately led to Colonel Miller's probable cause determination. *Id*. 46:12–16. However, Colonel Miller did not incorporate the Dorval Affidavit's request for a controlled delivery of the Subject Parcel as a condition precedent to conducting the search. *Id*. 13:4–10, 44:17–45:8, 47:1–7. Colonel Miller explicitly conveyed to all in attendance at the meeting his decision that a controlled delivery was unnecessary. *Id*.; *see also id*. 45:9–46:4.

The next morning, agents searched Defendant's residence and truck without first performing a controlled delivery of the Subject Parcel. They recovered additional silencers, as well as seventeen unregistered firearms, nearly seven thousand rounds of ammunition, and roughly one hundred sixty military headsets that appeared to be stolen.

## II.   SUMMARY OF ARGUMENTS

Defendant argues that "the triggering event underlying the anticipatory search authorization did not occur prior to the search of [Defendant's] [r]esidence and [t]ruck, and the search thus lacked probable cause." Mot. 1. Here, the alleged triggering condition was the proposed controlled delivery of the Subject Parcel to Defendant's residence. Defendant further maintains that the good faith exception to the exclusionary rule cannot apply because "the primary nexus between [Defendant] and the alleged criminal activity is the [S]ubject [P]arcel, and the probable cause to search [Defendant's] [r]esidence (and presumably his truck) hinged on the controlled delivery of the [S]ubject [P]arcel to the [r]esidence." *Id*. at 6. According to Defendant, it was objectively unreasonable for the officers to execute the search without the controlled delivery. *Id*.

The Government responds that Colonel Miller, who "became concerned about what Defendant might do if suddenly cornered with the prospect of being arrested," made an independent determination that probable cause existed even without the controlled delivery and, therefore, verbally removed the condition precedent in accordance with Military Rule of Evidence 315, which explicitly permits oral search authorizations.  Resp. 4.[9]  Alternatively, the Government contends that the good faith exception applies because the agents who executed the search "acted reasonably by relying on a statement from their base commander that they had authority to conduct the search."  *Id.* at 6.

In Reply, Defendant asserts that the Government "has provided no written evidence of an oral order by [Colonel Miller] as required by military standards governing search and seizure."  Reply 1.  Specifically, Defendant argues that Colonel Miller failed to memorialize the verbal search authorization as required by AFIs 51–201 and 31–120, thus the Government "is limited to the written record available without considering the aborted delivery."  *Id.* at 2.  Additionally, Defendant asserts that Colonel Miller's concern for officer safety could not override the predicate-controlled delivery, consequently the search lacked probable cause.  Finally, Defendant claims that the Warrant, once deprived of the condition precedent, lacked probable cause to support the search.  *Id.* at 6.

---

[9] At the hearing on the Motion, the Government seemed to shift its position.  It now asserts that the search authorization was never orally modified by Colonel Miller.  Rather, the Government advances an argument that Colonel Miller's search authorization, as memorialized by the Warrant, occurred after he decided against a controlled delivery.  Essentially, the Government now asserts that Colonel Miller could not modify a search that was never authorized.  The Court will address what was briefed by the parties in addition to the Government's new position.

### III.   LEGAL STANDARD

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.   "The basic purpose of this Amendment, as recognized in countless decisions of th[e Supreme] Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cty. of S.F.*, 387 U.S. 523, 528 (1967).   To effectuate this basic purpose, the Supreme Court "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009).

### IV.   ANALYSIS

#### A. The Search Authorization

Defendant first argues that the Warrant was anticipatory and therefore lacked probable cause because AFOSI agents never delivered the Subject Parcel to his on-base residence. [10]   Defendant grounds this argument in the Warrant itself, which "incorporates the attached affidavit of SA Nicholas J. Dorval, dated 18 FEB 20." Mot., Ex. 1 at 1.  Specifically, Defendant directs the Court to the Dorval Affidavit's request "for an anticipatory search authorization for the SUBJECT PREMISES to be executed, contingent upon the delivery of the SUBJECT PARCEL." *Id*. at 9.  The Court disagrees with Defendant that the Dorval Affidavit modified the Warrant.  Instead, the Court concludes that Colonel Miller authorized the search without requiring a controlled delivery.

*1.   The Search was not Conditioned upon the Controlled Delivery of the Subject Parcel*

As background, "[a]n anticipatory warrant is a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place.  Most anticipatory warrants subject their execution to some condition precedent

other than the mere passage of time[—]a so-called 'triggering condition.'" *United States v. Moya-Breton*, 329 F. App'x 839, 842 (10th Cir. 2009) (unpublished) (quoting *United States v. Grubbs,* 547 U.S. 90, 94 (2006)).  Thus, an anticipatory search warrant has two probable cause requirements:

> [F]or a conditioned anticipatory warrant to comply with the Fourth Amendment's requirement of probable cause, two prerequisites of probability must be satisfied. It must be true not only that if the triggering condition occurs there is a fair probability that contraband or evidence of a crime will be found in a particular place, but also that there is probable cause to believe the triggering condition will occur. The supporting affidavit must provide the magistrate with sufficient information to evaluate both aspects of the probable-cause determination.

*Grubbs,* 547 U.S. at 96–97 (internal quotation marks and citations omitted) (emphasis in original).

Courts generally void an anticipatory search warrant if the triggering condition never occurs. *See United States v. Rowland*, 145 F.3d 1194, 1201 (10th Cir. 1998) (probable cause for anticipatory warrants is contingent on the occurrence of certain expected or "triggering" events, typically the future delivery, sale, or purchase of contraband.); *United States v. Rey*, 923 F.2d 1217, 1221 (6th Cir. 1991); *see also Grubbs*, 547 U.S. at 100–01 (Souter, J., concurring in part and concurring in the judgment) ("[I]f an officer . . . makes the ostensibly authorized search before the unstated condition has been met, the search will be held unreasonable."); *but cf. United States v. Vigneau*, 187 F.3d 70, 80 (1st Cir.1999), cert. denied, 528 U.S. 1172 (2000) ("whether the condition was satisfied . . . is beside the point" where "leaving the package at the door did nothing to establish probable cause to search the premises" and "probable cause existed to search the premises without delivery of the package").

---

[10] Disappointingly, the Government stated at the hearing that Defendant does not attack probable cause.  *See* Tr. 25:20–23.  Fortunately for Defendant, however, the Court read the Motion, which explicitly argues that "[w]ithout the controlled delivery, the anticipatory search warrant lacked probable cause and must be suppressed."  Thus, the six-page Response fell below the standard customarily demonstrated by the Government.  The Court also notes, however, that Defendant's briefing, which totaled fourteen pages, similarly glossed over most of the issues.

Although the Court appreciates Defendant's argument on this point, at the outset it finds that the search (or the probable cause supporting the authorization) was not conditioned upon the controlled delivery of the Subject parcel, i.e., the Warrant was not anticipatory. Rather, Colonel Miller's testimony, which the Court finds credible, establishes that he did not authorize the Warrant until after he determined that the controlled delivery would not take place. *See* Tr. 12:19–23, 13:4–10. Major Sauer and Special Agent Dorval's testimony clearly substantiate this timeline. *Id*. 44:17–45:8, 47:1–7, 55:11–16. Furthermore, Colonel Miller testified that his probable cause determination was not contingent upon but rather independent from the controlled delivery of the Subject Parcel. Tr. 12:15–23.

Additionally, the Warrant's incorporation of the Dorval Affidavit does not invalidate the search for two reasons. First, Colonel Miller testified that the Warrant only incorporated the Dorval Affidavit to document the underlying investigation. *Id*. 46:12–16. Second, Colonel Miller, as base commander of KAFB, can verbally authorize searches, making the Warrant's incorporation of the Dorval Affidavit a mere formality.

To be sure, the Fourth Amendment protects members of the armed services from unreasonable searches and seizures with different standards than those that apply in the civilian context. *Henson v. United States*, 27 Fed. Cl. 581, 592 (1993). The Supreme Court "has long recognized that the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743 (1974). Because "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian," reasonable expectations of privacy in the military society will differ from those in the civilian society. *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953). Accordingly, "[t]he fundamental necessity for obedience, and the

consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Parker*, 417 U.S. at 758.

This principle is embodied in Military Rule of Evidence 315, which dictates "[a]n 'authorization to search' is an express permission, written or *oral*, issued by a competent military authority to search a person or an area for specified property or evidence or for a specific person and to seize such property evidence or person." *United States v. Banks*, 451 F.3d 721, 727 (10th Cir. 2006) (emphasis added) (quoting Mil. R. Evid. 315(f)(2)(B)).  An authority to search must be supported by probable cause, which can be determined on the basis of "[o]ral statements communicated to the authorizing official in person, via telephone, or by other appropriate means of communication." *Id*. (quoting Mil. R. Evid. 315(f)(2)(B)).

With this understanding, even if this Court were to construe the face of the Warrant as affirmatively requiring a controlled delivery, Colonel Miller's verbal statements authorizing the search without that condition would control the constitutional analysis.  *See United States v. Brown*, 784 F.2d 1033, 1036 (10th Cir. 1986) (This [verbal] "authorization to search" is the military equivalent of what is known in civilian parlance as a search warrant."); *see also id*. ("The Military Rule also authorizes that permission to search may be given orally or in writing.").

### 2.  *Air Force Instructions do not Invalidate the Search Authorization*

This leads into Defendant's next argument, where he asserts that Colonel Miller was required to subsequently memorialize (or amend) the Warrant to reflect that the controlled delivery had been severed.  Again, to be clear, the Court has already found that the Warrant was not modified by the Dorval Affidavit nor was the Warrant ever amended.  As authorized, the Warrant did not include a condition precedent.  But even if this Court agreed with Defendant's theory that a modification occurred, any subsequent failure by Colonel Miller to reduce that alleged amendment into writing

10

would not provide Defendant his requested relief.  For example, Defendant argues that AFIs require memorialization after a verbal search authorization by a base commander.  For this proposition, Defendant relies on AFI 51-201, which applies to Judge Advocates, and AFI 31-120, which applies to Air Force Security Forces.   AFI 51–201 states:

> **Section 5A—Search, Seizure, and Apprehension**
>
> **5.1. Authorization for Search, Seizure, and Apprehension.**  Per the Secretary of the Air Force, military judges are empowered to grant search authorizations in accordance with M.R.E. 315.  Only military judges and qualified commanders have the authority to grant search authorizations.  This authority is not delegable. Qualifying Air Force commanders and military judges may authorize searches, seizures, and apprehensions based upon probable cause for personnel and locations within the military span of control. Qualifying commanders are defined at paragraph 5.4.1.1.

AFI 51-201, *Administration of Military Justice* (January 18, 2019), at 40.  AFI 51-201 further explains that:

> **5.1.3.** Air Force Form 1176, Authority to Search and Seize, is used to document authorization for a search of a person, location, or property and seizure of property pursuant to M.R.E. 315(d) . . . When required by circumstances, oral or verbal authorization may be given *but should be followed by written documentation*.

AFI 51-201 at § 5.1.3 (emphasis added). [11]  Air Force Instruction 31-120 prescribes:

> **4.6. AF Form 1176, Authority to Search and Seize**. . . . Use the AF Form 1176 to

---

[11] Defendant relies on a superseded version of AFI 51-201 (*Dec. 8, 2017*):

> **Section 3A—Search, Seizure, and Apprehension**
>
> **3.1. Authorization for Search, Seizure, and Apprehension**. Air Force commanders, military judges, and military magistrates may authorize searches, seizures, and apprehensions based upon probable cause. Air Force Form 1176, Authority to Search and Seize, is used to document authorization for a search of a person, location, or property and seizure of property pursuant to Military Rule of Evidence 315(d). The Air Force Form 3226, Authority to Apprehend in Private Dwelling, is used to document authorization to apprehend someone in a private dwelling pursuant to Rule for Courts-Martial 302(e)(2)(C) and Military Rule of Evidence 315(d). *When required by circumstances, oral or verbal authorization may be given but should be followed by written documentation.*

AFI 51-201, Administration of Military Justice (December 8, 2017).  In addition to featuring different section numbers (§3 rather than § 5), the above italicized sentence is separated into its own subsection, i.e., § 5.1.3, in the version applicable during the relevant time.  *See* AFI 51-201 (*January 18, 2019*) § 5.1.3.  However, this distinction has no effect on the Court's analysis.

> ensure the search and seizure is legal and any evidence found is admissible at a courts-martial and Magistrate Court. This form is prepared for the signature of the commander having search authority over a specific area, property or person to be searched. The commander may give verbal authority to search only after a probable cause briefing to him/her is accomplished and the situation warrants immediate search. *The commander must sign the AF Form 1176 as soon as possible after oral authorization. Once the form is signed, Security Forces will retain and place it into the case file.*

*See* AFI 31-120, Security Forces Systems and Administration (April 1, 2015), at 32 (emphasis added).

To begin, AFI 51-201—which governs Air Force Judge Advocate Generals—states that an "oral or verbal authorization may be given but *should* be followed by written documentation." AFI 51-201 § 5.1 (emphasis added). Conversely, AFI 31-120—which governs Air Force Security Forces—dictates that the "commander *must sign* the Form AF–1176 *as soon as possible* after oral authorization." AFI 31-120 § 4.6 (emphases added). Given that the AFIs contradict on whether memorialization is even required and that each AFI applies to different sections of the Air Force, i.e., law (JAG) and enforcement (military police/security forces), the Court would not invalidate the search based Colonel Miller's alleged failure to amend the Warrant in writing.[12]

This decision is further informed by Defendant's own witness, Lieutenant Colonel Nicholas McCue, the Chief Circuit Defense Counsel for the Western Circuit. During the hearing, Lieutenant Colonel McCue admitted that, in approximately seventeen years of experience as a JAG officer, he has (1) never used AFI 51–201 nor seen it, (2) has no experience with it, and (3) has no idea whether

---

[12] Furthermore, *should*, as used in AFI 51-201, is not a mandatory directive. *See Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1264 (10th Cir. 2018) ("should" urges compliance but does not require it); *see also Tippett v. United States*, 108 F.3d 1194, 1198 (10th Cir. 1997) ("should" implies some limitation of discretion). Nor does the term *shall* completely restrict discretion. *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 761 (2005) ("shall" imposed no duty under Colorado law); *see also* Bryan A. Garner, Shall We Abandon Shall, A.B.A. J. 26 (2012) (observing that in Black's Law Dictionary, "shall is a chameleon-hued word" that has over five definitions); Joseph Kimble, *The Many Misuses of Shall*, 3 Scribes J. Leg. Writing 61 (1992).

it can trigger the exclusionary rule.  *See* Tr. 68:10–69:16, 72:10–17.  But more importantly, with respect to the military, the Tenth Circuit has already held that "oral affidavits and oral authorization of search warrants without contemporaneous writings are free from any constitutional infirmity." *Brown*, 784 F.2d at 1037 (citing *Wallis v. O'Kier*, 491 F.2d 1323, 1325 (10th Cir.), cert. denied, 419 U.S. 901 (1974)).  The *Brown* court also noted that "as long as the military respects the rights guaranteed by the Fourth Amendment's prohibition against unreasonable searches and seizures, the military need not be bound by all of the procedural formalities that are imposed upon civilian law enforcement agencies." *Id*. (quoting *United States v. Rogers*, 388 F.Supp. 298, 301 (E.D.Va.1975)). Simply put, even if a modification did occur, it might be best practices to amend the Warrant to accurately capture the authority that was ultimately granted, but it is not required to effectuate a constitutionally firm search of an active duty servicemember on a military installation, especially when an independent probable cause determination was made.  *See* Tr. 52–53:3.

### 3.   *The Search was Supported by Probable Cause*

Because Defendant cannot find relief based on the preceding arguments, the Court will now turn to the main theatre of contention, whether the search authorization was adequately supported by probable cause.  On January 15, 2021, in response to the Government's misguided contention that probable cause was not contested in the Motion, *see* n.10, Defendant filed DEFENDANT JUSTICE'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS (Doc. 68) ("Supplement") to "confirm and reiterate the basis for his contention that, absent the execution of the controlled delivery, the subject affidavit lacks probable cause." Supplement at 1.  Defendant argues that, without the controlled delivery, the Dorval Affidavit failed to establish a nexus between Defendant's residence and illegal contraband.  *Id*. at 2.

Essentially, Defendant's assault on probable cause is threefold.  First, Defendant asserts that

13

the Dorval Affidavit only speaks to HSI's beliefs and suspicions that NFA controlled items were previously delivered to his on-base residence.  According to Defendant, "beliefs and suspicions are not facts.  No actual evidence was presented that the gun parts were addressed or sent to the [r]esidence."  *Id*. at 3.  Second, in response to the Government's assertion that Colonel Miller removed the controlled delivery for safety concerns, Defendant maintains that "Colonel Miller's safety concerns do not rise to the level of imminent, exigent circumstances to support probable cause for an immediate search.  The lack of exigent circumstances is particularly evidenced by the fact that Colonel Miller's search authority allowed for a full 14 days for the search to be executed."  *Id*. at 4–5.  Finally, Defendant attacks the Dorval Affidavit's reference to AFI 31–101, which requires airmen to register firearms and receive approval from a unit commander prior to storing them at an on-base residence (or in an armory).  Here, Defendant argues that AFI  31–101 applies only to firearms and not gun parts.  *Id*. at 5 (relying on the Rules for Courts-Martial definition of "firearm").[13]  Thus, Defendant contends that the "AFI requirement, therefore, does not apply to any of the alleged gun parts in this case, and further erodes the government's claim that the search was supported by probable cause."  *Id*.

For its part, the Government argues—without proffering any authority—that the Court can only review Colonel Miller's search authorization for an abuse of discretion.  But the Government nonetheless asserts that Colonel Miller's search authorization accorded with the probable cause requirement of Military Rule of Evidence 315.  The Court agrees that Colonel Miller's authorization did not offend Defendant's constitutional right as an active duty airman against unreasonable searches conducted on a military installation.

---

[13] The Rules for Courts-Martial define "firearm" as "any weapon which is designed to or may be readily converted to expel any projectile by the action of an explosive."  R.C.M. 103(12).

As applicable to civilians, "probable cause to issue a search warrant . . . exists when the supporting affidavit sets forth sufficient facts that would lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime." *Rowland*, 145 F.3d at 1204. Thus, "[a] search warrant must be supported by probable cause, requiring more than mere suspicion but less evidence than is necessary to convict." *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000) (internal quotation marks omitted). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990). "This nexus exists when the affidavit 'describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are in a particular place.'" *United States v. Knox*, 883 F.3d 1262, 1277 (10th Cir.), cert. denied, 139 S. Ct. 197, 202 L. Ed. 2d 123 (2018) (quoting *United States v. Villanueva*, 821 F.3d 1226, 1236 (10th Cir. 2016)).

In accordance with military law, a search is based on probable cause if "there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched." Mil. R. Evid. 315(f)(2) (emphasis added). A search authorization may be based on hearsay evidence in whole or in part. *Id.* A probable cause determination is based on any of the following:

> (A) written statements communicated to the authorizing official; (B) oral statements communicated to the authorizing official in person, via telephone, or by other appropriate means of communication; or (C) such information as may be known by the authorizing official that would not preclude the officer from acting in an impartial fashion. The Secretary of Defense or the Secretary concerned may prescribe additional requirements through regulation.

*Id.* at (f)(2)(A)-(C). Clearly, this rule is a mere codification of the probable cause analysis. *See United States v. Carter*, 54 M.J. 414, 420 (C.A.A.F. 2001). Therefore, the Court will rely on Tenth Circuit precedent when testing Colonel Miller's authorization.

At the outset, the Court notes that its review of the issuance of a warrant is deferential, especially when issued by a military commander; "so long as [Colonel Miller] had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks and citation omitted).  The supporting affidavit is viewed as a whole, given the totality of the information contained therein.  *United States v. Glover*, 104 F.3d 1570, 1578 (10th Cir. 1997) (overruled in part on other grounds by *Corley v. United States*, 556 U.S. 303, 313 (2009)).  Federal courts are cautioned to "resolve doubtful or marginal cases by deferring to a . . . judge's determination of probable cause."  *United States v. Biglow*, 562 F.3d 1272, 1282 (10th Cir. 2009).

Defendant maintains that the investigating agents' "beliefs and suspicions are not facts" and that "[n]o actual evidence was presented that the gun parts were addressed or sent to the Residence." However, "[w]hile the nexus requirement—like probable cause itself—is not reducible 'to a neat set of legal rules,'" Tenth Circuit "case law reveals that little 'additional evidence' is generally required to satisfy the Fourth Amendment's strictures."  *Biglow*, 562 F.3d at 1279 (quoting *Maryland v. Pringle*, 540 U.S. 366, 372 (2003)).  "[T]he nexus between the place to be searched and the evidence sought may be established through normal inferences about the location of evidence."  *Id*. at 1280.

Here, the Dorval Affidavit coupled with the information conveyed by several federal agencies to Colonel Miller before and during the February 18, 2020 meeting, set forth more than a substantial basis for linking contraband to Defendant's on-base residence.[14]   Indeed, CBP intercepted in route from China the Subject Parcel and confirmed that it met the Gun Control Act's

---

[14] Contrary to Defendant's assertion, Colonel Miller was not constrained to the four corners of the Dorval Affidavit when he made his probable cause determination.  *See* Mil. R. Evid. 315(f)(2)(A)–(C); *see also* Tr. 73:22–75:2 (testimony of Lieutenant Colonel McCue).  Colonel Miller's probable cause determination, as established by his testimony, was further informed by several federal agencies conducting the investigation.  *See* Tr. 22:19–20, 38:10–24.

definition of a silencer.  SA Meskill also confirmed that the Subject Parcel was a silencer.  HSI, CBP, and AFOSI  all confirmed that (1) Defendant, a resident of KAFB, was the addressee of the Subject Parcel, (2) the Subject Parcel was shipped from China by "Xiaohuji," and (3) the Subject Parcel was mislabeled as a "fuel filter."  ATF confirmed that Defendant did not apply for nor obtain the requisite permit and tax stamp to possess or receive NFA regulated items.  Air Force Security Forces confirmed that, under AFI  31–101, Defendant could not store any firearms at his on-base residence.[15]  Additionally, HSI possessed records showing that Defendant placed over thirty orders to China during a ten-month period through wish.com, a website associated with the dark web and a known trafficker of illegal gun parts.  Based on previous investigations into mislabeled packages, HSI believed that fifteen of these orders were for illegal gun parts.  HSI further believed that these orders were successfully delivered to Defendant's on-base residence.  Lastly, Defendant's military record reflected a prior instance of ammunition theft.

Clearly, it was no stretch for Colonel Miller to conclude that there was a fair probability that Defendant stored contraband at his on-base residence.  Tellingly, thirty international orders through a website known for illegally selling NFA controlled items, fifteen of which were believed to contain contraband, and an order actually confirmed to contain an unlawful silencer, support that conclusion.  Simply put, Colonel Miller was reasonable to assume that Defendant stored guns or NFA controlled items at Defendant's on-base residence.  Under the totality of the circumstances, the Court concludes that all of the information relayed to Colonel Miller provided a substantial basis for probable cause to support the search authorization.

Lastly, the Court also rejects Defendant's misguided contention that Colonel Miller's safety

---

[15] Defendant argues that AFI  31–101 applies only to firearms and not gun parts.  However, this fact is only one of many that create an inference that *guns* were being illegally stored at Defendant's on-base residence, i.e., gun parts modify guns.  This reasoning applies equally to Defendant's prior theft of ammunition.

concern did not provide probable cause to search the residence.  As an initial matter, Colonel Miller testified that he determined probable cause existed without the controlled delivery, and that determination was memorialized via Form AF 1176.  Furthermore, as discussed above, probable cause supported the search.  Therefore, whether an exigency existed is irrelevant here, especially when exigent circumstances excuse only the warrant requirement under the Fourth Amendment—a requirement not applicable to military search authorizations.

### B.  Good Faith

Finally, although the Court concludes that the search accorded with the Fourth Amendment's protections in the military context, even if Colonel Miller's authorization caused violence to Defendant's constitutional right against unreasonable searches, the facts of this case are a textbook application of the good faith exception to the exclusionary rule.

In the civilian context, under the good faith exception, improperly obtained evidence is admissible when the executing officers "act with an objectively 'reasonable good-faith belief' that their conduct is lawful or when their conduct involves only simple, 'isolated' negligence . . . ." *Davis v. United States*, 564 U.S. 229, 238 (2011) (citations omitted) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984) and *Herring*, 555 U.S. at 137).  The rationale for the exclusionary rule "is to deter future Fourth Amendment violations." *Davis*, 564 U.S. 229, 236 (2011).  Thus, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 147.  But when law a law enforcement officer acts "in an objectively reasonable manner, on a mistake made by someone other than the officer," "there is no police illegality and thus nothing to deter." *United States v. Loera*, 923 F.3d 907, 925 (10th Cir.), cert. denied, 140 S. Ct. 417, 205 L. Ed. 2d 238 (2019) (citation omitted).

Under military law, evidence obtained as the result of an unlawful search may be used if:

(A) the search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization under Mil. R. Evid. 315(d) or from a search warrant or arrest warrant issued by competent civilian authority; (B) the individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and (C) the officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith is to be determined using an objective standard.

Mil. R. Evid. 311(c)(3)(A)–(C).

Similar to how civilian law informs the military probable cause standard, the military good faith exception embodies *Leon* and its progeny. *See Carter*, 54 M.J. 414, 421 (C.A.A.F. 2001) ("we conclude that Mil. R. Evid. 311[] does not establish a more stringent rule than *Leon* did for civilian courts."); *see also United States v. Perkins*, 78 M.J. 381, 387 (C.A.A.F. 2019) (reaffirming *Carter*); *United States v. White*, 80 M.J. 322, 328 n.7 (C.A.A.F. 2020) ("This Court has understood M.R.E. 311(c)(3) as seeking 'to codify the good faith exception as stated' in *Leon*" (quoting *Perkins*, 78 M.J. at 387)). Thus, *Leon* and its progeny will guide this Court's good faith analysis.

Here,[16] Defendant's argument is simply that "AFOSI agents are well aware of the requirements for probable cause, and it was unreasonable for the AFOSI to execute a search without the originally planned controlled delivery and under the contrived and unsupported general concern for safety." Reply 8. This argument is a non-starter for several reasons. First, the testimony establishes that Colonel Miller made a probable cause determination separate and independent from the controlled delivery while AFOSI's agents were present at the February 18, 2020, hearing. Colonel Miller's probable cause determination was informed by Major Sauer, an attorney, and

---

[16] Defendant originally argued that the Dorval Affidavit's proposed controlled delivery controlled the good faith analysis. *See* Mot. 6 ("The affidavit was unambiguous. If the controlled delivery did not occur as described, the requested search was not authorized and would not be executed. . . . As such, by the express terms of the search authorization and absent the completion of the controlled delivery, law enforcement personnel lacked both authority and probable cause, to execute the search.").

further supported by information supplied by several Federal agencies.  Second, and the Court cannot stress this enough, just because the Dorval Affidavit requested a controlled delivery does not mean that Colonel Miller's probable cause determination hinged on it; the record is clearly loaded with probable cause sufficient to support the search authorization.  Finally, and most importantly, even if the authorization did require the controlled delivery to establish probable cause,  AFOSI agents in effectuating the search acted in an "objectively reasonable manner, on a mistake made by [Colonel Miller]," consequently  "there is no [agent] illegality and thus nothing to deter."  *Loera*, 923 F.3d at 925 (quoting *Leon*, 468 U.S. at 921).

To be sure, the *Leon* good-faith exception does not apply when (1) the magistrate judge issuing the warrant was misled by a deliberately or recklessly false affidavit; (2) the magistrate judge wholly abandoned the judge's detached and neutral judicial role; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that the executing officers cannot reasonably presume it to be valid.  *Leon*, 468 U.S. at 923.  In such instances, "a reasonably well trained officer would have known that the search was illegal", and, as a result, suppression of the unlawfully obtained evidence remains an appropriate remedy.  *Herring*, 555 U.S. at 145 (internal citations and quotation marks omitted).

None of these scenarios apply here.  All AFOSI agents knew that Colonel Miller authorized the search without the controlled delivery.  And Colonel Miller's search authorization was nothing short of an order given by the base commander, the highest-ranking officer on the installation.  *See* Tr. 10:17–25.  This Court cannot imagine how an AFOSI agent's actions could be considered unreasonable for complying with that order, especially given the rank structure of the military.  Furthermore, Colonel Miller did not merely rubber stamp the search authorization.  Rather, he

20

consulted over the course of a week with several federal agencies before the February 18, 2020, meeting, which itself proves that he adequately considered the underlying facts of the investigation.

Now turning to the Warrant, even if it explicitly included a condition on its face instead of through incorporation, Colonel Miller's oral grant of authority controls in the military context, and AFOSI agents know this.  Plus, irrespective of the proposed controlled delivery, the Dorval Affidavit contained considerable factual detail that contraband would be found at Defendant's residence. Consequently, AFOSI agents reasonably relied in good faith on the search authorization issued by Colonel Miller.

## V.    CONCLUSION

Colonel Miller's search authorization was not contingent upon the controlled delivery of the Subject Parcel.  Additionally, he had a substantial basis for determining that probable cause existed, and this conclusion was separate and distinct from the controlled delivery.

IT IS THEREFORE ORDERED that DEFENDANT'S MOTION TO SUPPRESS SEARCH OF 760B SILVERBERRY CIRCLE, SE, KIRTLAND AIR FORCE BASE, N.M., 87116, AND DEFENDANT'S TRUCK (Doc. 45) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE